# Exhibit 1

1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars
3   Los Angeles, California  90067-6035
    Telephone: (310) 553-6700
4
    VISION L. WINTER (S.B. #234172)
5   vwinter@omm.com
    KAITLYN GOSEWEHR (S.B. #313458)
6   kgosewehr@omm.com
    O'MELVENY & MYERS LLP
7   2765 Sand Hill Road
    Menlo Park, California  94025-7019
8   Telephone: (650) 473-2600

9   MEGAN HAVSTAD (S.B. #287938)
    mhavstad@omm.com
10  O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
11  San Francisco, California 94111-3823
    Telephone: (415) 984-8927
12
    Attorneys for Plaintiff MILLENNIUM TOWER
13  ASSOCIATION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELECTRONICALLY

F I L E D

*Superior  Court of California,*
*County of San Francisco*

**04/16/2018**
**Clerk of the Court**
BY:EDNALEEN ALEGRE
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| MILLENNIUM TOWER ASSOCIATION, a California nonprofit mutual benefit corporation, | Case No. CGC-17-557830 |
| Plaintiff, | **FIFTH AMENDED COMPLAINT FOR:** |
| v. | **1) VIOLATION OF CAL. CIV. CODE § 895 *ET SEQ.*;** |
| | **2) NEGLIGENCE;** |
| MISSION STREET DEVELOPMENT LLC, a Delaware Limited Liability Company; MISSION STREET HOLDINGS LLC, a Delaware Limited Liability Company; MILLENNIUM PARTNERS MANAGEMENT LLC, a New York Limited Liability Company; MILLENNIUM PARTNERS LLC, a New York Limited Liability Company; MILLENNIUM PARTNERS I, INC., a New York Corporation; CHRISTOPHER M. JEFFRIES, an individual; PHILIP E. AARONS, an individual; PHILIP H. LOVETT, an individual; SEAN JEFFRIES, an individual; JOHN LUCIANO, an individual; WEBCOR CONSTRUCTION, INC., an unknown business entity; WEBCOR CONSTRUCTION LP, dba WEBCOR BUILDERS, a California Limited Partnership; HANDEL ARCHITECTS LLP, a New York Limited Liability | **3) BREACH OF EXPRESS WARRANTIES;** **4) BREACH OF IMPLIED WARRANTIES;** **5) STRICT LIABILITY;** **6) NEGLIGENT MISREPRESENTATION;** **7) FRAUDULENT MISREPRESENTATION;** **8) FRAUDULENT CONCEALMENT;** **9) BREACH OF FIDUCIARY DUTY;** **10) VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*;** **11) INVERSE CONDEMNATION;** **12) TRESPASS;** **13) NUISANCE;** **14) VIOLATION OF CAL. CIV. CODE § 832; AND** |

1   Partnership; TREADWELL & ROLLO, INC., an
    unknown business entity; T & R CONSOLIDATED,
2   INC., a California Corporation and successor in
    interest to TREADWELL & ROLLO; LANGAN
3   ENGINEERING AND ENVIRONMENTAL
    SERVICES, INC., a New Jersey Corporation and
4   successor in interest to TREADWELL & ROLLO;
    DESIMONE CONSULTING ENGINEERS LLC, a
5   Delaware Limited Liability Company; DESIMONE
    CONSULTING ENGINEERS, PLLC, a California
6   Professional Limited Liability Company;
    TRANSBAY JOINT POWERS AUTHORITY, a
7   public entity; ARUP NORTH AMERICA
    LIMITED, a United Kingdom Corporation;
8   TRANSBAY TOWER LLC, a Delaware Limited
    Liability Company; BOSTON PROPERTIES, INC.,
9   a Delaware Corporation; CLARK-HATHAWAY
    DINWIDDIE, a Joint Venture; and DOES 1 through
10  100,

11              Defendants.

**15) VERIFIED PETITION FOR WRIT OF MANDATE.**

**JURY TRIAL DEMANDED**

- 2 -

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    THE PROPERTY ................................................................................................. 7

III.   THE PARTIES...................................................................................................... 8

IV.    SECONDARY LIABILITY................................................................................ 17

       A.     Single Enterprise Liability ..................................................................... 17

              1.     Millennium Defendants................................................................ 17

       B.     Alter Ego Liability .................................................................................. 18

              1.     Millennium Founders.................................................................... 19

              2.     Millennium Defendants................................................................ 28

       C.     Principal Agent Liability......................................................................... 32

              1.     Millennium Defendants................................................................ 32

V.     JURISDICTION AND VENUE ....................................................................... 36

VI.    EASEMENT AGREEMENTS AND FEIR ....................................................... 36

VII.   THE DEFECTS................................................................................................. 39

       A.     Compliance with RORA ......................................................................... 42

VIII.  CAUSES OF ACTION ..................................................................................... 45

FIRST CAUSE OF ACTION ........................................................................................ 45

       A.     Direct Liability........................................................................................ 45

       B.     Secondary Liability ................................................................................. 47

SECOND CAUSE OF ACTION .................................................................................... 47

       A.     Direct Liability........................................................................................ 47

       B.     Secondary Liability ................................................................................. 52

THIRD CAUSE OF ACTION ........................................................................................ 52

       A.     Direct Liability........................................................................................ 52

**TABLE OF CONTENTS**
(continued)

Page

B.    Secondary Liability ........................................................................................... 54

FOURTH CAUSE OF ACTION ........................................................................................... 55

A.    Direct Liability ................................................................................................... 55

B.    Secondary Liability ........................................................................................... 57

FIFTH CAUSE OF ACTION ................................................................................................ 57

A.    Direct Liability ................................................................................................... 57

B.    Secondary Liability ........................................................................................... 60

SIXTH CAUSE OF ACTION ............................................................................................... 61

A.    Direct Liability ................................................................................................... 61

B.    Secondary Liability ........................................................................................... 63

SEVENTH CAUSE OF ACTION .......................................................................................... 64

A.    Direct Liability ................................................................................................... 64

B.    Secondary Liability ........................................................................................... 66

EIGHTH CAUSE OF ACTION ............................................................................................ 67

A.    Direct Liability ................................................................................................... 67

B.    Secondary Liability ........................................................................................... 71

NINTH CAUSE OF ACTION ............................................................................................... 73

A.    Direct Liability ................................................................................................... 73

B.    Secondary Liability ........................................................................................... 75

TENTH CAUSE OF ACTION .............................................................................................. 76

A.    Direct Liability ................................................................................................... 77

B.    Secondary Liability ........................................................................................... 78

ELEVENTH CAUSE OF ACTION ....................................................................................... 79

TWELFTH CAUSE OF ACTION ......................................................................................... 81

**TABLE OF CONTENTS**
(continued)

Page

THIRTEENTH CAUSE OF ACTION ........................................................................................ 82

FOURTEENTH CAUSE OF ACTION ..................................................................................... 83

FIFTEENTH CAUSE OF ACTION .......................................................................................... 85

IX.      PRAYER FOR RELIEF............................................................................................. 87

X.       DEMAND FOR JURY TRIAL.................................................................................. 88

# I.  **INTRODUCTION**

1.      The Millennium Tower, a 419-unit luxury condominium project at 301 Mission Street in San Francisco, was the tallest residential high rise on the West Coast when it opened in 2009.  Shimmering like a translucent 58-story crystal, this landmark structure attracted a diverse community of more than a thousand residents.  Urban professionals welcomed the opportunity to live minutes from the financial district's hive of corporate headquarters; retirees and empty-nesters traded the equity in their suburban homes for the panoramic vistas of a waterfront skyscraper; and young families with children embraced the unique experience of a vertical neighborhood.  With units averaging nearly $2 million, the tower's developer, Millennium Partners, generated in excess of $750 million in sales between 2009 and 2013.[1]

2.      To the dismay of those who sank so much of their life savings into the Millennium Tower, the Tower itself is now sinking—and has been for years, even before the first unit was sold in 2009.  As much of the Bay Area and beyond has come to learn, Millennium Partners erected this glamorous building on an improperly designed and constructed foundation system, then looked the other way as the building was further besieged by other construction defects and negligent construction practices.  By the time it debuted as "the luxury benchmark for San Francisco city living,"[2] the high-rise tower had already sunk more than 8 inches into the mud, sand, and clay on which it was built.  And the sinking continues unabated.  The Tower has since dropped another 8 inches, bringing it now 16 inches closer to the "diverse tapestry of arts, culture and culinary delights"[3] that originally drew its residents to this vibrant South of Market neighborhood.  As the Tower has sunk, it has also tilted.  The precast concrete floors are now non-level, and at the top, where a penthouse unit sold for $9.8 million, the tower leans by more than 12 inches.

---

[1] J.K. Dineen, *Millennium Tower in San Francisco is a $750M sellout*, S.F. Bus. Times (Apr. 5, 2013), http://www.bizjournals.com/sanfrancisco/print-edition/2013/04/05/millennium-tower-in-san-francisco-is.html.

[2] Millennium Partners, http://millenniumptrs.com/about-mp/ (last visited Mar. 28, 2017).

[3] *Id.*

3.      But those who knew of the high rise's troubles kept it secret for years, and two parties even memorialized their agreement to keep all exchanged documents and information confidential.[4] Millennium Partners and the Transbay Joint Powers Authority ("TJPA"), which was preparing to build an underground and above-ground transit center ("Transit Center") on an adjacent site, entered into a bilateral confidentiality agreement covering all documents and information exchanged.  Rejecting transparency and accountability, Millennium Partners and the TJPA agreed that the "[d]ocuments and information" exchanged about the Property and the Transit Center were proprietary and confidential.[5]  The Millennium Tower Association ("HOA")—the not-for-profit association responsible for the key building systems—was shut out, and the truth about the mounting problems was hidden, and stayed hidden, for many years.

4.      For its part, Millennium Partners is an experienced New York-based real estate development conglomerate of individuals and entities that boasts of having developed more than 2,900 luxury condominiums, eight five-star hotels, including the 40-story Four Seasons near Moscone Center, two extended-stay luxury hotels, 1,200,000 square feet of office space, and 1,000,000 square feet of retail space, among other developments.[6]  It claims to own and operate an impressive portfolio worth over $4 billion.[7]  In other words, purchasers of Millennium Tower units had every reason to believe that they were placing their faith in a developer with the resources and know-how to properly design and construct a building whose height was not a moving target.  And, in addition to the residents who bought into the dream of a world-class property built to the highest standards, the other inhabitants of bustling SoMa reasonably trusted that the slender skyscraper towering above them was constructed responsibly.

---

[4] The March 17, 2010 Confidentiality Agreement replaced and superseded a February 26, 2010 agreement in its entirety, and the parties to the March 17, 2010 Confidentiality Agreement agreed that the "February 26, 2010 agreement shall have no further force and effect."

[5] Confidentiality Agreement between Millennium Partners and the TJPA (March 17, 2010).

[6] Millennium Partners, http://millenniumptrs.com/about-mp/ (last visited Mar. 28, 2017).

[7] Id.

5.        Christopher Jeffries and his son Sean Jeffries directed and led the development of Millennium Tower.  Christopher Jeffries is a founder of certain of the related Millennium Partner entities and retains the largest ownership interest in several of the entities.[8]  Even with his vast holdings, Christopher Jeffries himself makes the final decisions about the Millennium Tower and speaks with authority about the causes of its sinking and tilting.  Christopher Jeffries was the primary spokesperson for Millennium Partners at its September 20, 2016 press conference at City Hall, where he insisted that "[Millennium Partners] did this building the right way."[9]  The co-founders of certain of the related Millennium Partners entities, Philip Aarons and Philip Lovett, also had significant involvement overseeing and managing the development of the Millennium Tower, but, as Mr. Aarons testified, "the final decisions at Millennium are made by Chris Jeffries."[10]

6.        Other day-to-day responsibilities for the Millennium Tower's development fell to Sean Jeffries, leader of West Coast development for Millennium Partners and the entity that Millennium Partners created to oversee the project at 301 Mission Street—Mission Street Development.  As part of a strategic nationwide push, Sean Jeffries had expanded the West Coast office to complete various projects valued at over a billion dollars, including the Millennium Tower.[11]  Vice President John Luciano, whom Millennium Partners installed on the HOA board from 2009 to 2016, joined Sean Jeffries on the West Coast.

7.        After the confidential exchange of documents over the Millennium Tower's worsening condition, both Sean Jeffries and John Luciano kept the alarming data regarding the Tower's sinking from the HOA and continued selling the condominium units to unsuspecting homeowners.  This subterfuge went on for years as Millennium Partners, and

---

[8] Aug. 12, 2010 Philip Aarons Dep. 9:11-13 & 43:17-21, cited as Ex. 5 to Plaintiff's Notice of Filing Exhibits in Support of Plaintiffs' Responses to Defendants' Motions for Summary Judgment and Motions for Judgment on the Pleadings, *Altenel, Inc. v. Millennium Partners, LLC, et al.*, No. 1:11-cv-22806-KMW, ECF No. 338-5.

[9] Associated Press, *San Francisco Skyscraper Is Leaning - And Sinking,* Popular Mechs. (Oct. 24, 2016), http://www.popularmechanics.com/technology/infrastructure/a23521/san-francisco-skyscraper-is-leaningand-sinking/.

[10] Aug. 12, 2010 Philip Aarons Dep. 42:18-21, *supra* note 8.

[11] Kristine Carber, *The Feel-Good Developer*, Gentry Wealth (Summer 2012).

1  specifically Sean Jeffries, kept receiving regular reports that the Millennium Tower was

2  sinking and tilting but never shared those reports with the HOA.

3        8.     Sean Jeffries, acting on behalf of Millennium Partners, helped to make sure

4  that no other entity shared that information, either.  The TJPA, for instance, had been granted

5  certain easements to the Millennium Tower property, which the agency needed to proceed

6  with its excavation activities.  Sean Jeffries signed the original October 10, 2008 easement

7  agreement as the authorized representative of Mission Street Development.  After

8  responsibility for the Millennium Tower transferred from Mission Street Development to the

9  HOA, the easement agreement had to be updated in 2011 to reflect that change; the

10  amendment required the TJPA to provide monitoring data, which would have included the

11  building's sinking and tilting, to Mission Street Development and the HOA.  Sean Jeffries

12  signed the amended easement agreement and designated himself as the HOA's "authorized

13  representative"—thereby intercepting the TJPA's data before it could ever reach the HOA

14  members not employed by Millennium Partners.[12]  On information and belief, the HOA

15  alleges that Sean Jeffries was not an official member of the board of directors of the HOA at

16  the time of signing and was not authorized by the HOA to sign or receive the monitoring data

17  on behalf of the HOA.

18        9.     Long after construction was complete and all units had been sold, Sean Jeffries

19  continued to involve himself with the building's management and attend periodic HOA

20  meetings.  In early 2014, after the Tower had sunk over 13 inches, and residents noticed signs

21  of sidewalk settlement, Sean Jeffries wrote to the HOA's president to propose quarterly

22  meetings between the HOA and Millennium Partners.  Sean Jeffries also agreed to provide

23  updates on the adjoining TJPA construction site, where the Transit Center was still under

24  construction, including substantial underground work to accommodate the extension of the

25  Caltrain line and the future High Speed Rail project.

26        10.    In a February 2014 update to the HOA, Sean Jeffries professed ignorance

27

28  _____

[12] At least two board members were residents not employed by Millennium Partners at the time the September 1, 2011 First Amendment to the Easement Agreement was signed.

about the Tower's troubles: "I have not been made aware to date of any information that gives us concern for the safety of the building or any significant impact on the structure."[13]  But Sean Jeffries was aware.  He knew that the Tower was sinking and tilting (and had already sunk approximately 13 inches by that time), and he knew that excavation for the TJPA's underground "train box" and the associated construction were significantly impacting the Tower.  Rather than alert those who had the most to lose, Sean Jeffries continued to hide this information from the HOA.

11.     The TJPA and the private parties involved in the development of the Transit Center and the skyscraper across the street—the Transbay Tower, also known as the Salesforce Tower (the "Salesforce Tower")—likewise knew that their construction activities would affect the Millennium Tower and that its excavation activities alone would cause the Tower to sink further.  As a condition of the easement permitting access to the Millennium Tower, the TJPA agreed that "[t]he Support System and the Transit Center shall be designed and constructed to stabilize the soil beneath the [property], prevent the material movement and/or settlement of the [property] and provide for the structural support, integrity and safety of the [property] during and after TJPA's construction of the Transit Center . . . ."[14]

12.     But instead of preventing damage to the Millennium Tower, the construction of the Transit Center and the Salesforce Tower exacerbated the problems with the Millennium Tower.  Both the TJPA's construction activities at the Transit Center and the construction activities at the Salesforce Tower, including dewatering, excavation, and the installation of tiebacks on land adjacent to the Millennium Tower and the Millennium Tower property itself, have led to increased sinking and tilting of the Millennium Tower.  The TJPA's data shows that as demolition, dewatering, and other construction activities for the Transit Center and Salesforce Tower began, the rate of settlement and tilting of the Tower increased.  The construction activities at the Salesforce Tower have also contributed to one or more breaches of the shoring wall at the Transit Center site and inadequate performance of the shoring wall

---

[13] Letter from Sean Jeffries (Millennium Partners) to Jeff Peters (HOA) (Feb. 28, 2014).

[14] October 10, 2008 Easement Agreement between the TJPA and Mission Street Development.

system at the Salesforce Tower site.

13.     The TJPA and Salesforce Tower developers, through their massive, ill-planned construction operations, and Millennium Partners, with its defective design and construction, all contributed to the myriad problems plaguing the Millennium Tower.  These problems were compounded by the active concealment by Millennium Partners and its employees, and the apparent complicity of the TJPA.

14.     Other factors, including inadequate garage construction and waterproofing, defective windows, curtain wall corrosion and water intrusion, inter-unit odor transmission, cracks, and alignment issues, have also taken a toll on the livability of the Millennium Tower. Millennium Partners bills the property as "rare" and "an address like no other."  And it is indeed rare and unique, but now mainly because failures of this magnitude in planning, design, development, and construction are almost unheard of in contemporary high rises.

15.     Burdened with design and construction defects, and further battered by the TJPA construction activities on its land and the adjoining property, the Millennium Tower has continued its slow descent into the prehistoric clay on which it was built.  Unable to initially detect the sinking and tilting on its own—and kept from the truth by the parties that did know—the HOA learned far too late of the conditions jeopardizing the Millennium Tower. Had it known sooner, the HOA could have demanded that the developer implement a retrofit, or it could have sought to halt other activities contributing to the damage, such as those of the TJPA.

16.     Millennium Partners and the TJPA now each publically places unequivocal blame on the other.  Regardless of who contributed most to the damage, one fact is indisputable: Both Millennium Partners and the TJPA possessed the damning data but did nothing with it.  Neither tried to stem the sinking; neither sought to alert the HOA.

17.     And now, in an attempt to show that adjoining construction sites are the exclusive cause of the sinking, Millennium Partners has sought an order to stop the TJPA from any final dewatering.  Forced to confront its own culpability, Millennium Partners instead points the finger at others, despite sitting on the data for years and never seeking to

1  stop the dewatering when it would have made a difference.

2       18.     The victims of this debacle are the residents and the HOA, who placed their

3  trust and confidence—and over half a billion dollars—in the hands of Millennium Partners.

4  With this Complaint for strict liability, breach of warranties, fraud, and negligence, as well as

5  violations of the California Civil Code and California Business and Professions Code, among

6  other claims, the HOA seeks what it plainly deserves—a safe home free from continued

7  sinking and tilting, the same home that its members though they were buying before the truth

8  was revealed.

9  ## II.      __THE PROPERTY__

10       19.     The Millennium Tower development is located at 301 Mission Street in San

11  Francisco and comprises three primary structures: a 58-story tower (the "Tower"), an adjacent

12  12-story building on a reinforced concrete podium that includes residences and common areas

13  (the "Podium"), and a five-level subterranean garage (the "Garage") (collectively, the Tower,

14  the Podium, and the Garage constitute the "Millennium Tower" or "Property").  The

15  Millennium Tower consists of 419 separate residential condominiums and two commercial

16  units, forming a mixed-use condominium project.

17       20.     The underlying real property is a rectangular lot measuring approximately

18  183.5 feet by 275 feet, a total area of approximately 50,463 square feet.  The Property is

19  bounded by Mission Street to the northwest, Fremont Street to the southwest, and Beale Street

20  to the northeast.  The future Transit Center abuts the Property to the southeast, and the

21  temporary and permanent easements granted to the TJPA encroach five feet onto the Property

22  on the southeast side.  The Salesforce Tower is directly across Fremont Street from the

23  Property at 415 Mission Street, with the construction activities relating to the Salesforce

24  Tower Defendants extending below Fremont Street on the land adjoining the Millennium

25  Tower and on the Property itself.

26       21.     The Millennium Tower is more fully described in the Map entitled "Final Map

27  4146 A 420 Unit Residential Unit and 8 Commercial Unit Mixed Use Condominium Project"

28  filed for record in the Official Records of the City and County of San Francisco, State of

1   California, on May 15, 2008, in Book 105 of Condominium Maps, pages 146-147 (the

2   "Center Map"), being Lot 19 of Assessor's Block 3719, to be developed as described on the

3   condominium plan entitled "A Mixed Use Condominium Plan for Millennium Tower – 301

4   Mission Street – San Francisco, California" filed for record in the Official Records of the City

5   and County of San Francisco, State of California, on March 13, 2009, as Document Number

6   2009-I732547-00 in Reel J847, Image 0102, and more particularly, contains two Commercial

7   Components and three Residential Components.

8         22.     Under the governing documents, and pursuant to California law, the HOA is

9   the owner of the common areas of the Millennium Tower, including but not limited to the

10  land, foundations, footings, beams, supports, roofs, interior and exterior load-bearing walls,

11  Garage, basement areas, exterior building surfaces, window walls, curtain walls, glazing,

12  electrical rooms, sewer and drainage systems, and utility pipes and conduits.  The HOA is

13  responsible for the operation and administration of the common areas and the maintenance,

14  repair, and replacement of all improvements within the common areas.  The HOA has the sole

15  and exclusive right to pursue claims and causes of action related to deficiencies in, and

16  damage to, the common areas of the Millennium Tower.

17  ### III.    THE PARTIES

18        23.     Plaintiff HOA is a California nonprofit mutual benefit corporation formed and

19  existing under the laws of the State of California and established as a common interest

20  development, as described in California Civil Code sections 4080 and 5980, with its principal

21  place of business within the County of San Francisco, California.  The HOA represents the

22  interests of the owners of condominium units, including both those used for residential and

23  those used for commercial purposes, and the sub-associations in this common-interest

24  development.

25        24.     By the express terms of the HOA's governing documents, and pursuant to

26  California Civil Code section 5980, the HOA has the general authority and responsibility to

27  bring this action in its own name as the real party in interest and without joining with it the

28  members in matters pertaining to the Millennium Tower.

25.     The HOA has the sole and exclusive right and duty to manage, operate, control, repair, replace, and restore the Millennium Tower, including the right to enter into contracts to accomplish its duties and obligations.  It also has all the powers necessary to carry out its rights and obligations, including the right, duty, and power to contract for legal services to prosecute any action affecting the HOA when it deems such action necessary to enforce its powers, rights, and obligations, including the bringing of this action.  Under California Civil Code sections 4775 and 5980, the HOA seeks recovery for damages to the Millennium Tower, including, among other things, damages to the common areas; damages to the separate interests that the HOA is obligated to maintain and repair; and damages to the separate interests within the HOA's common interest, power, and standing.

26.     Defendant Mission Street Development LLC ("MSD") is a limited liability company formed and existing under the laws of the State of Delaware, and doing business in the City and County of San Francisco, California, including the development, construction, improvement, marketing, and sale of the Millennium Tower and its units.

27.     Defendant Mission Street Holdings LLC ("MSH") is a limited liability company formed and existing under the laws of the State of Delaware, and doing business in the City and County of San Francisco, California, including the development, construction, improvement, marketing, and sale of the Millennium Tower and its units.

28.     Defendant Millennium Partners Management LLC ("MPM") is a limited liability company formed and existing under the laws of the State of New York, and doing business in the City and County of San Francisco, California, including the development, construction, improvement, marketing, and sale of the Millennium Tower and its units.  MPM was the "Assured" for a 2007 loss occurring at the Millennium Tower.  On information and belief, the HOA alleges that MPM employees were also entitled to a discounted price on Millennium Tower units by virtue of MPM's involvement and affiliation with the development.

29.     Defendant Millennium Partners LLC ("MP LLC") is a limited liability company formed and existing under the laws of the State of New York, and doing business in

the City and County of San Francisco, California, including the development, construction, improvement, marketing, and sale of the Millennium Tower and its units.  MP LLC served as a guarantor in connection with a loan provided to MSD in 2005, the purpose of which was to finance the construction of the Millennium Tower, for which it received payment from MSD. And pursuant to the Millennium Tower Move In/Out Procedures, MP LLC is required to be listed as an additional insured on moving companies' liability insurance policies.

30.     Defendant Millennium Partners I, Inc. ("MPI") is a corporation formed and existing under the laws of the State of New York, and doing business in California as New York SF Millennium Partners I, Inc., including the development, construction, improvement, marketing, and sale of the Millennium Tower and its units.  MPI has been in the real estate development business since at least 1992.

31.     Collectively, MSD, MSH, MPM, MP LLC, and MPI constitute the "Millennium Defendants."  All of the Millennium Defendants are non-public entities about whom little to no financial information is publicly available.  All of the Millennium Defendants were integral to the development of the Millennium Tower and profited from the development, construction, improvement, marketing, or sale of the Millennium Tower and its units.

32.     Defendant Christopher M. Jeffries is a Founding Partner, Principal, and controlling shareholder of MPI.  He is also the President of MSH, MPM, and MP LLC.  On information and belief, Christopher Jeffries was at all times in control of the day-to-day management and operation of MSD with Philip Aarons and Philip Lovett, as required by the loan agreement that financed the construction of the Millennium Tower.  He has been heavily involved in the development, management, and sale of the Millennium Tower and its units. In particular, he was a key participant in the decision to build the Tower with concrete instead of a steel frame, resulting in a significantly heavier building than original designs called for. On information and belief, he was also aware of the Tower's sinking as early as 2007 and participated in bad-faith efforts to conceal the sinking problem from unsuspecting homebuyers and the HOA until all of the Tower's units were sold and the profits from those

1    sales could be transferred from MSD to avoid liability from the sinking.

2          33.    Defendant Philip E. Aarons is a Founding Partner, Principal, and shareholder

3    of MPI.  He is also Vice President and Secretary of MSH, Vice President of MPM, and Vice

4    President of MP LLC.  On information and belief, Philip Aarons was at all times in control of

5    the day-to-day management and operation of MSD with Christopher Jeffries and Philip

6    Lovett, as required by the loan agreement that financed the construction of the Millennium

7    Tower.  He has been heavily involved in the development, management, and sale of the

8    Millennium Tower and its units.  On information and belief, he was also aware of the Tower's

9    sinking as early as 2007 and participated in bad-faith efforts to conceal the sinking problem

10   from unsuspecting homebuyers and the HOA until all of the Tower's units were sold and the

11   profits from those sales could be transferred from MSD to avoid liability from the sinking.

12         34.    Defendant Philip H. Lovett is a Founding Partner, Principal, and shareholder of

13   MPI.  He is also Vice President of MSH, Vice President of MPM, and Vice President and

14   Secretary of MP LLC.  On information and belief, Philip Lovett was at all times in control of

15   the day-to-day management and operation of MSD with Christopher Jeffries and Philip

16   Aarons, as required by the loan agreement that financed the construction of the Millennium

17   Tower.  He has been heavily involved in the development, management, and or sale of the

18   Millennium Tower and its units.  In particular, he directed the Millennium Tower's

19   condominium sales and services strategies and business plan for the project.  He also

20   participated in the design and layout of the Millennium Tower units.  On information and

21   belief, he was also aware of the Tower's sinking as early as 2007 and participated in bad-faith

22   efforts to conceal the sinking from unsuspecting homebuyers and the HOA until all of the

23   Tower's units were sold and the profits from those sales could be transferred from MSD to

24   avoid liability from the sinking.  On one occasion, he spoke directly with a prospective

25   homebuyer who was concerned about the Tower's sinking as early as December 2009, and

26   assuaged the prospective homebuyer's concerns by minimizing the Tower's increasingly

27   serious problems.

28         35.    Collectively, Christopher Jeffries, Aarons, and Lovett constitute the

"Millennium Founders."  Allegations directed at Millennium Partners, rather than any specific entity, apply to the conduct for which the specific Millennium Partners legal entity obscured its legal identity.  In situations where the specific legal entity can be identified, the allegations are directed towards the specific legal entity as identified herein.  For example, when Millennium Partners I, Inc. ("MPI") conducts business as "Millennium Partners, Inc." or "Millennium Partners," this complaint refers to the entity as MPI.  On information and belief, at least some conduct taken in the name of "Millennium Partners" was undertaken on behalf of MPI.  On information and belief, "Millennium Partners" failed to comply with the fictitious business name statutes, California Business and Professions Code section 17900 *et seq.*, thereby precluding parties such as the HOA from understanding the true identity or identities of the legal entities doing business under the name "Millennium Partners."

36.     Defendant Sean Jeffries is Vice President of MSH and the authorized agent of MSD and MPM.  Sean Jeffries signed the September 1, 2011 First Amendment to the Easement Agreement between the TJPA and the HOA, and was listed as the designated recipient of monitoring data from the TJPA regarding the sinking and tilting of the Tower.  In this capacity but without authorization by the HOA, he volunteered and undertook to act on behalf of the HOA, effectively participating in HOA board meetings as if he were a member of the HOA's board, and thus owed a fiduciary duty to the HOA to keep them informed about any issues with the Millennium Tower.  Sean Jeffries is a resident of San Francisco, California.

37.     Defendant John Luciano is Vice President of MPM and was the Property Manager for Millennium Partners in relation to the Millennium Tower.  He was also a member of the HOA's board from 2009 through 2016.  Luciano was involved in the development, management, and sale of the Millennium Tower and its condominium units.  As a representative of the entities with sole access to certain information about the Tower, Luciano owed a fiduciary duty to the HOA to keep the HOA informed about any issues with the Millennium Tower.  John Luciano is a resident of San Francisco, California.

38.     Defendant Webcor Construction LP ("Webcor"), is the survivor to a merger

1   with Webcor Construction, Inc., and is a limited partnership formed under the laws of the

2   State of California with its principal place of business in California and doing business as

3   "Webcor Builders."  Webcor Construction, Inc. was a corporation formed under the laws of

4   the State of California, with its principal place of business in California, and also doing

5   business as "Webcor Builders."  Webcor entered into an Agreement for Construction

6   Management Services with MSD to act as the general contractor for the Millennium

7   Defendants in the construction of the Millennium Tower.

8       39.     Defendant Handel Architects LLP ("Handel") is a limited liability partnership

9   doing business in the City and County of San Francisco, California.  Handel was the architect

10  of record and designed the Millennium Tower and its components.

11      40.     Defendant Treadwell & Rollo, Inc. ("Treadwell & Rollo") is a dissolved

12  corporation that had its principal place of business in the City and County of San Francisco,

13  California.  Treadwell & Rollo was the geotechnical engineer of record for the Millennium

14  Tower.   Treadwell & Rollo was subsequently known as T & R Consolidated, Inc.  Treadwell

15  & Rollo sold its assets to Langan Engineering and Environmental Services, Inc. before

16  dissolving.

17      41.     Defendant Langan Engineering and Environmental Services, Inc. ("Langan")

18  is a New Jersey corporation engaged in various geotechnical, environmental, and other

19  engineering services, and is the successor in interest to Treadwell & Rollo, subsequently

20  known as T & R Consolidated.  Langan's liability as the successor in interest to Treadwell &

21  Rollo is based on the following factual allegations:

22          a.  All or substantially all of Treadwell & Rollo's assets were transferred

23              to Langan pursuant to an Asset Purchase Agreement on November 1,

24              2010.

25          b.  On information and belief, the HOA alleges that this asset transfer was

26              not supported by adequate consideration.

27          c.  Treadwell & Rollo legally changed its name to Treadwell & Rollo

28              Consolidated, Inc. ("T & R Consolidated") after the asset purchase.  T

13

FIFTH AMENDED COMPLAINT

      & R Consolidated subsequently dissolved and no longer exists as an
operating entity.

d.    Plans called for Treadwell & Rollo to maintain its name for an interim period, but be branded "A Langan Company."  In 2012, it would become known as "Langan Engineering & Environmental Services."[15]

e.    One or more individuals were officers, directors, or stockholders of both Treadwell & Rollo and Langan.  Philip Tringale was President of Treadwell & Rollo, Inc., and currently is Director of Western Operations at Langan Engineering & Environmental Services.  He represents that the start date for both positions was March 1992.[16]

f.    Langan acquired all assets necessary to carry on Treadwell & Rollo's business, including its goodwill, books and records, licenses, trade accounts, and employees.

g.    Langan continued to conduct business at Treadwell & Rollo's prior business address with substantially the same personnel Treadwell & Rollo employed, and the same general business operations that Treadwell & Rollo previously conducted.

h.    Both Langan and Treadwell & Rollo publicly referred to the transaction as a merger between the two companies.

i.    Langan assumed the obligations of Treadwell & Rollo necessary for the continuation of Treadwell & Rollo's business obligations.  Indeed, it continued on with Treadwell & Rollo's obligations at 301 Mission Street: From approximately 2012 through 2013, "Treadwell & Rollo: A Langan Company" produced memoranda to Millennium Partners evaluating Arup's settlement monitoring measurements.  In 2014,

---

[15] PR Newswire, *Langan Acquires Treadwell & Rollo* (Nov. 1, 2010), http://www.prnewswire.com/news-releases/langan-acquires-treadwell--rollo-106465148.html.

[16] Philip Tringale, LinkedIn, https://www.linkedin.com/in/philip-tringale-85b37711/.

1    "Langan Treadwell Rollo" continued with the same evaluation

2    memoranda using the same template.  And in December 2016,

3    "Langan" continued the work Treadwell & Rollo had begun, presenting

4    the results of building survey measurements in a Building Survey

5    Report.

6    42.    Defendant DeSimone Consulting Engineers LLC ("DeSimone") is a limited

7    liability company organized under the laws of the State of Delaware and doing business in the

8    City and County of San Francisco, California.  DeSimone LLC acted as the structural

9    engineer for the Millennium Defendants in connection with the design and construction of the

10   Millennium Tower.  DeSimone LLC filed a Cross-Complaint and an Answer admitting to

11   providing structural engineering services at 301 Mission Street in the related matter, *Laura S.*

12   *Lehman, et. al. v. Transbay Joint Powers Authority, et al.* DeSimone is also known as

13   DeSimone Consulting Engineers, PLLC, and is also a professional limited liability company

14   organized under the laws of the State of California and doing business in the City and County

15   of San Francisco, California.  DeSimone entered an Agreement for Structural Engineering

16   Services to act as structural engineer for the Millennium Defendants in connection with the

17   design and construction of the Millennium Tower.

18   43.    Collectively, Treadwell & Rollo, Langan, and DeSimone are the "Engineering

19   Defendants."

20   44.    Defendant Transbay Joint Powers Authority ("TJPA") is a government joint

21   powers entity created under California Government Code section 6500 *et seq.* with its

22   principal office located at 201 Mission Street, Suite 2100, San Francisco, California 94105.

23   The TJPA was created by a Joint Power Agreement dated April 2, 2001 between the City and

24   County of San Francisco, the Alameda-Contra Costa Transit District, and the Peninsula

25   Corridor Joint Power Board.  The TJPA is the entity charged with developing the Transbay

26   Terminal, which includes construction of the five-story Transit Center and underground train

27   facility directly adjacent to the Property.

28   45.    Defendant Arup North America Ltd. ("Arup") is a corporation formed under

15

1   the laws of the United Kingdom, and on information and belief has its principal place of

2   business in California.  Arup is a geotechnical engineering firm who was retained by the

3   TJPA's architect, Pelli Clarke Pelli Architects, to provide geotechnical studies of the soil

4   underlying, and foundation of, the Transbay Terminal Project, and to design a below-ground

5   buttress pile wall on and adjacent to the Property.

6          46.    Defendant Transbay Tower LLC is a limited liability company organized

7   under the laws of the State of Delaware and conducting business within the State of

8   California.  Transbay Tower LLC is the owner and one of the developers of the Salesforce

9   Tower, located at 415 Mission Street in San Francisco, California.

10          47.    Defendant Boston Properties, Inc. is a corporation organized under the laws of

11   the State of Delaware and conducting business within the State of California.  On information

12   and belief, Boston Properties, Inc. is a participant in, and exercises decision-making authority

13   over, the development of the Salesforce Tower.

14          48.    Defendant Clark-Hathaway Dinwiddie, A Joint Venture, is a joint venture

15   formed by Clark Construction Group, LLC and Hathaway Dinwiddie Construction Company

16   in connection with the construction of the Salesforce Tower.  On information and belief,

17   Clark-Hathaway was Transbay Tower LLC's general contractor responsible for managing the

18   construction of the Salesforce Tower.  Collectively, Transbay Tower LLC, Boston Properties,

19   Inc., and Clark-Hathaway Dinwiddie constitute the "Salesforce Tower Defendants."

20          49.    The HOA is ignorant of the true names and capacities of defendants sued as

21   Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names.

22   The HOA will amend this Complaint to allege the true names and capacities of these

23   defendants when ascertained.  Each of the fictitiously named defendants is, or will be,

24   responsible for the occurrences alleged in this Complaint and for the HOA's injuries, both

25   existing and prospective.  Each Doe defendant legally and proximately caused damage to the

26   HOA.  Each and every Doe defendant had a duty to the HOA to use reasonable care in

27   performing the tasks related to the planning, development, creation, improvement, design,

28   construction, supervision, observation, inspection, management, and/or repair of the

Millennium Tower.

## IV.    SECONDARY LIABILITY

### A.    Single Enterprise Liability

#### 1.    Millennium Defendants

50.    The Millennium Defendants are all collectively secondarily liable as a single enterprise for the direct acts and omissions of each of their component entities—MSD, MSH, MPM, MP LLC, and MPI—alleged herein.  Although there are technically five legal entities, "there is but one enterprise," and this enterprise "has been so handled that it should respond, as a whole, for the debts of certain component elements of it."  *See Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal. App. 3d 1220, 1248 (1991).  Accordingly, the Court should construct, for purposes of imposing liability, an entity comprising the assets and liabilities of all the Millennium Defendants, and charge it with the liabilities of all the Millennium Defendants. *See id.*  The Millennium Defendants' secondary liability as a single enterprise is based on at least the following factual allegations:

a.  The use of each of the component entities of the Millennium Defendants as mere shells, instrumentalities, and conduits for a single purpose—the development of the Millennium Tower;

b.  The use by each of the component entities of the Millennium Defendants of the same offices and business location;

c.  The employment by each of the Millennium Defendants of the same employees and attorney;

d.  The failure to adequately capitalize MSD, MSH, and MPM;

e.  The disregard of legal formalities and the failure to maintain arm's length relationships among the Millennium Defendants;

f.  The concealment of the identity of the specific responsible Millennium Defendants;

g.  The use of component entities of the Millennium Defendants to shield against liability of other component Millennium Defendant entities;

h.  The fact that adherence to the fiction of a separate corporate existence of each of the five Millennium Defendants would promote injustice under these circumstances; and

i.  The fact that throughout the entire period of development, from the concept of the Millennium Tower development in the late 1990s to the sales and management extending from 2009 to 2016, the Millennium Defendants acted as a single enterprise and capitalized on the name recognition of that single enterprise to reap hundreds of millions of dollars in revenues.  In dozens of official documents, the Millennium Defendants represented that the owner and developer of the Millennium Tower was "Millennium Partners" and acted as a single entity.  The Millennium Defendants made this representation to the San Francisco city officials responsible for permitting the Millennium Tower and prospective and actual homeowners of the units in the Millennium Tower.

j.  Despite having promoted and marketed the Tower as the work of the "Millennium Partners" before the building's defects were discovered, when employees and agents working for both MSD and other Millennium Defendants first learned of the Tower's excessive sinking as early as 2007, and then again when the problems grew increasing drastic in 2009, these employees and agents of MSD and the Millennium Defendants took steps in bad faith to erase the involvement of the other Millennium Defendants, the Millennium Founders, and the "Millennium Partners" in the Tower's development after the fact, both to isolate the liability for a potential lawsuit to MSD and to avoid paying the full cost of an extraordinarily expensive repair of the Tower's foundation.  The Millennium Defendants, operating at the direction of the Millennium Founders, also consciously decided to avoid making adequate disclosures to the HOA, residents, or prospective residents, about the sinking and tilting to minimize their liability.

**B.  Alter Ego Liability**

### 1.   Millennium Founders

51.     Christopher Jeffries is secondarily liable for the conduct of MSD, MSH, MPM, MP LLC, and MPI alleged herein because each of these five entities were and are the alter egos that Chris Jeffries used for the purpose of the Millennium Tower project.  Each of MSD, MSH, MPM, MP LLC, and MPI were at all relevant times the alter egos of Chris Jeffries.  A direct or indirect unity of interest and ownership existed between each of MSD, MSH, MPM, MP LLC, and MPI, on the one hand, and Chris Jeffries on the other hand, and adherence to the fiction of separate corporate existence would promote injustice under these circumstances.  Because the Millennium Defendants are all non-public entities, the full extent of Chris Jeffries' influence and control over all of the Millennium Entities is within the exclusive knowledge of Chris Jeffries.  Chris Jeffries' alter ego liability is based on at least the following factual allegations:

   a.  Christopher Jeffries directs and manages all Millennium Partners' projects, including all of the conduct with respect to the Millennium Tower undertaken by MSD, MSH, MPM, MP LLC, and MPI.  This has been the case since he founded Millennium Partners and "set his sights on key gateway cities across the United States" for his new form of mixed-use developments.[17]  His co-founder Aarons acknowledged as much, stating that Christopher Jeffries makes the "final decisions" at Millennium.[18]  This is also specifically true as to the Millennium Tower: Christopher Jeffries took ownership of and defended the Tower on behalf of MPI at a September 20, 2016 press conference declaring: "We did this building the right way."[19]

   b.  Chris Jeffries' efforts to develop, construct, improve, market, and sell the Millennium Tower by using, dominating, and controlling MSD, MSH, MPM,

---

[17] Millennium Partners, http://millenniumptrs.com (last visited Mar. 28, 2017).

[18] Aug. 12, 2010 Philip Aarons Dep. 42:18-21, cited as Ex. 5 to Plaintiff's Notice of Filing Exhibits in Support of Plaintiffs' Responses to Defendants' Motions for Summary Judgment and Motions for Judgment on the Pleadings, *Altenel, Inc. v. Millennium Partners, LLC, et al.*, No. 1:11-cv-22806-KMW, ECF No. 338-5.

[19] Associated Press, *San Francisco Skyscraper Is Leaning - And Sinking,* Popular Mechs. (Oct. 24, 2016), http://www.popularmechanics.com/technology/infrastructure/a23521/san-francisco-skyscraper-is-leaningand-sinking/.

1   MP LLC, and MPI allowed him, to effectuate the dream of developing

2   "housing with a lifestyle" across the country.[20]  In so doing, Chris Jeffries

3   dominated and controlled the affairs of MSD, MSH, MPM, MP LLC, and

4   MPI, using them as mere conduits for his worldwide real estate development

5   pursuits.

6       c.   Chris Jeffries profited from sales of condominium units in the Millennium

7            Tower and benefitted from the success of the Millennium Tower in his other

8            business ventures.

9       d.   Chris Jeffries controlled and dominated MSD, MSH, MPM, MP LLC, and

10           MPI when making crucial decisions about the development, construction,

11           and management of the Millennium Tower.  For example, the residential

12           layouts were the product of his vision.  A memorandum enclosing a revised

13           plan of the amenity level and mid-rise building layouts incorporated Chris

14           Jeffries' comments.[21]

15      e.   Chris Jeffries disregarded the formal distinctions between MSD, MSH,

16           MPM, MP LLC, and MPI treating them as the same.  For example, Chris

17           Jeffries sent memoranda reviewing and suggesting changes to 301 Mission

18           plans on "Millennium Partners" letterhead.[22]   In addition, "Millennium

19           Partners" was the recipient of invoices for construction and other

20           professional services completed at the Millennium Tower by various

21           firms.[23]

22      f.   The assets of MSD, MSH, MPM, MP LLC, and MPI were commingled in

23

---

24   [20] Jennifer Frey, *Striking It Ritz; For the, er, Richly Deserving, a Not-So-Humble Abode*, Wash.
     Post, Aug. 24, 1999.

25   [21] Memorandum from Glenn Rescalvo to Phil Lovett, Richard Baumert, Sean Jeffries and Steve
26   Patterson re Amenity Level/Mid-rise layouts (Sept. 21, 2005).

27   [22] Memorandum from Chris Jeffries to Mark Farrar, Sean Jeffries, Pamela Malkani & David
     Rothstein (May 20, 2002).

28   [23] J&C Fuentes Invoice (May 21, 2010); Architectural Energy Corp. Invoice (April 30, 2010);
     McMillan Companies Invoice (May 6, 2010).

the development of the Millennium Tower.  On information and belief, Chris Jeffries was involved in this commingling of assets and diverted the income and assets of the various entities without regard to the corporate form.

g.  Chris Jeffries shares his attorney with the Millennium Defendants.

h.  Chris Jeffries has benefited from the development, construction, and sale of the Millennium Tower such that it would be unjust if he were to escape liability for obligations associated with these benefits by adhering to the fiction that MSD, MSH, MPM, MP LLC, and MPI each have a separate corporate existence.  Modelling subsequent developments on the San Francisco Millennium Tower, Chris Jeffries has benefited from his reputation as a national leader in luxury living.  Without the "impressive portfolio across the nation," including the Millennium Tower San Francisco, Chris Jeffries could not have drawn on this powerful branding to advertise his latest project, the Millennium Tower in Boston.[24]  Accolades include the San Francisco Chamber of Commerce's "Excellence in Business—Building San Francisco" Award, which was accepted by Managing Director Baumert.[25]  In establishing a brand and a logo based on "Millennium Partners," which is identified with him personally, Chris Jeffries personally benefitted from the Millennium Tower and related projects.  But in order to draw upon the power of this national brand, Chris Jeffries must be required to take responsibility for the flaws in his various developments.

i.  Despite having promoted and marketed the Tower as the work of the "Millennium Partners" before the building's defects were discovered, when

---

[24] Upscale Living Magazine, Home/Real Estate/Millennium Boston Tower (2017), http://upscalelivingmag.com/millennium-boston-tower/.

[25] Business Wire, *Millennium Tower Honored at Excellence in Business Awards (Dec. 8, 2010),* http://www.businesswire.com/news/home/20101208006994/en/Millennium-Tower-Honored-Excellence-Business-Awards.

1      employees and agents working for both MSD and other Millennium

2      Defendants first learned of the Tower's excessive sinking as early as 2007, and

3      then again when the problems grew increasing drastic after 2009, these

4      employees and agents of MSD and the Millennium Defendants took steps in

5      bad faith to erase the involvement of the other Millennium Defendants and the

6      "Millennium Partners" in the Tower's development after the fact, both to

7      isolate the liability for a potential lawsuit to MSD and to avoid paying the full

8      cost of an extraordinarily expensive repair of the Tower's foundation.  On

9      information and belief, Chris Jeffries was involved in these bad faith efforts to

10      contain any liability associated with the Towers' defects to MSD, despite

11      knowing that MSD would not have sufficient assets to remedy the Tower's

12      defective foundation.  The Millennium Defendants, operating at the direction

13      of the Millennium Founders, also consciously decided to avoid making

14      adequate disclosures to the HOA, residents, or prospective residents, about the

15      sinking and tilting to minimize their liability.

16      52.     Philip Aarons is secondarily liable for the conduct of MSD, MSH, MPM, MP

17 LLC, and MPI alleged herein because each of these five entities were and are the alter egos that

18 Aarons used for the purpose of the Millennium Tower project.  Each of MSD, MSH, MPM, MP

19 LLC, and MPI were at all relevant times the alter egos of Aarons.  A direct or indirect unity of

20 interest and ownership existed between each of MSD, MSH, MPM, MP LLC, and MPI, on the

21 one hand, and Aarons on the other hand, and adherence to the fiction of separate corporate

22 existence would promote injustice under these circumstances.  Because the Millennium

23 Defendants are all non-public entities, the full extent of Aarons' influence and control over all of

24 the Millennium Entities is within the exclusive knowledge of Aarons.  Aarons' alter ego liability

25 is based on at least the following factual allegations:

26      a.    Aarons speaks and acts as a representative for and owner of Millennium

27      Partners, including all of the conduct with respect to the Millennium Tower

28      allegedly undertaken by MSD, MSH, MPM, MP LLC, and MPI.  He too

represented MPI at the September 2016 press conference.  Aarons was

involved in high-level strategic decisions about the Millennium Tower project

in its early development phases; for example, he joined Sean Jeffries to meet

with potential designers and architects for the project in 2006.  In 2003, when

speaking to the planning commissioners for the City and County of San

Francisco, Aarons stated in relation to the Millennium Tower "This project we

are especially proud of."  He is identified as an "Important MP [Person]" in the

Millennium Tower Sales Manual.[26]

    b.  Aarons' efforts to develop, construct, improve, market, and sell the

Millennium Tower by using, dominating, and controlling MSD, MSH, MPM,

MP LLC, and MPI allowed him, to effectuate the dream of developing

"housing with a lifestyle" across the country.[27]  In so doing, Aarons dominated

and controlled the affairs of MSD, MSH, MPM, MP LLC, and MPI, using

them as mere conduits for his worldwide real estate development pursuits.

    c.  Aarons profited from sales of condominium units in the Millennium Tower and

benefitted from the success of the Millennium Tower in his other business

ventures.

    d.  Aarons controlled and dominated MSD, MSH, MPM, MP LLC, and MPI

when making crucial decisions about the development, construction, and

management of the Millennium Tower.

    e.  Aarons disregarded the formal distinctions between MSD, MSH, MPM,

MP LLC, and MPI treating them as the same.  For example, he received

transmittals from Handel of Millennium Tower drawings and plans to

"Millennium Partners New York."[28] In addition, "Millennium Partners"

was the recipient of invoices for construction and other professional

---

[26] Millennium Tower San Francisco Sales Manual, Book 1, Oct. 2007.

[27] Jennifer Frey, *Striking It Ritz; For the, er, Richly Deserving, a Not-So-Humble Abode*, Wash. Post, Aug. 24, 1999.

[28] *See, e.g.*, Handel Architects Transmittal to Rod Johnson & Phil Lovett (June 19, 2006).

1    services completed at the Millennium Tower by various firms.[29]  Steven

2    Hood (an employee of Millennium Partners) and Sean Jeffries sent

3    correspondence related to the Millennium Tower on behalf of the

4    Millennium Defendants and on "Millennium Partners" letterhead. [30]

5       f.   The assets of MSD, MSH, MPM, MP LLC, and MPI were commingled in

6         the development of the Millennium Tower.  Aarons was involved in this

7         commingling of assets and diverted the income and assets of the various

8         entities without regard to the corporate form.

9       g.   Aarons shares his attorney with the Millennium Defendants.

10      h.   Aarons has benefited from the development, construction, and sale of the

11        Millennium Tower such that it would be unjust if he were to escape liability

12        for obligations associated with these benefits by adhering to the fiction that

13        MSD, MSH, MPM, MP LLC, and MPI each have a separate corporate

14        existence.  Modelling subsequent developments on the San Francisco

15        Millennium Tower, Aarons has benefited from Millennium Partners'

16        reputation as a national leader in luxury living.  Without the "impressive

17        portfolio across the nation," including the Millennium Tower San Francisco,

18        Aarons could not have drawn on this powerful branding to advertise his latest

19        project, the Millennium Tower in Boston.[31]  Accolades include the San

20        Francisco Chamber of Commerce's "Excellence in Business—Building San

21        Francisco" Award, which was accepted by Managing Director Baumert.[32]  In

22        establishing a brand and a logo based on "Millennium Partners," which is

23

24   [29] J&C Fuentes Invoice (May 21, 2010); Architectural Energy Corp. Invoice (April 30, 2010); McMillan Companies Invoice (May 6, 2010).

25   [30] Letter from Steven Hood to Kenneth Klein at Simpson Gumpertz & Heger (June 8, 2009). Letter from Sean Jeffries to Jeff Peters (Feb. 28, 2014).

26   [31] Upscale Living Magazine, Home/Real Estate/Millennium Boston Tower (2017), http://upscalelivingmag.com/millennium-boston-tower/.

27   [32] Business Wire, *Millennium Tower Honored at Excellence in Business Awards (Dec. 8, 2010),* http://www.businesswire.com/news/home/20101208006994/en/Millennium-Tower-Honored-Excellence-Business-Awards.

28

1       identified with him personally, Aarons personally benefitted from the

2       Millennium Tower and related projects.  But in order to draw upon the power

3       of this national brand, Aarons must be required to take responsibility for the

4       flaws in his various developments.

5       53.     Despite having promoted and marketed the Tower as the work of the "Millennium

6 Partners" before the building's defects were discovered, when employees and agents working for

7 both MSD and other Millennium Defendants first learned of the Tower's excessive sinking as

8 early as 2007, and then again when the problems grew increasing drastic after 2009, these

9 employees and agents of MSD and the Millennium Defendants took steps in bad faith to erase the

10 involvement of the other Millennium Defendants and the "Millennium Partners" in the Tower's

11 development after the fact, both to isolate the liability for a potential lawsuit to MSD and to avoid

12 paying the full cost of an extraordinarily expensive repair of the Tower's foundation.  On

13 information and belief, Philip Aarons was involved in these bad faith efforts to contain any

14 liability associated with the Towers' defects to MSD, despite knowing that MSD would not have

15 sufficient assets to remedy the Tower's defective foundation. The Millennium Defendants,

16 operating at the direction of the Millennium Founders, also consciously decided to avoid making

17 adequate disclosures to the HOA, residents, or prospective residents, about the sinking and tilting

18 to minimize their liability.  Philip Lovett is secondarily liable for the conduct of MSD, MSH,

19 MPM, MP LLC, and MPI alleged herein because each of these five entities were and are the alter

20 egos that Lovett used for the purpose of the Millennium Tower project.  Each of MSD, MSH,

21 MPM, MP LLC, and MPI were at all relevant times the alter egos of Lovett.  A direct or indirect

22 unity of interest and ownership existed between each of MSD, MSH, MPM, MP LLC, and MPI,

23 on the one hand, and Lovett on the other hand, and adherence to the fiction of separate corporate

24 existence would promote injustice under these circumstances.  Because the Millennium

25 Defendants are all non-public entities, the full extent of Lovett's influence and control over all of

26 the Millennium Entities is within the exclusive knowledge of Lovett.  Lovett's alter ego liability

27 is based on at least the following factual allegations:

28       a.   Lovett is responsible for the day-to-day operations and management of all

1    Millennium Partners projects, including all of the conduct with respect to the

2    Millennium Tower allegedly undertaken by MSD, MSH, MPM, MP LLC, and

3    MPI.[33]  Accordingly, he is listed as an emergency contact in the Millennium

4    Tower Sales Manual[34] and was involved in communications regarding the

5    budgets for each of the Millennium Tower constituent residences.[35]  He also

6    closely supervised the minutiae of building design decisions from the unit

7    finishes to the waterproofing of the garage.  Lovett exercised control over

8    several of the Millennium Partners entities as Vice President of MSH (which is

9    the sole member of MSD) and signed legal documents on behalf of MSD.

10    b.  Lovett's efforts to develop, construct, improve, market, and sell the

11         Millennium Tower by using, dominating, and controlling MSD, MSH, MPM,

12         MP LLC, and MPI allowed him, to effectuate the dream of developing

13         "housing with a lifestyle" across the country.[36]  In so doing, Lovett dominated

14         and controlled the affairs of MSD, MSH, MPM, MP LLC, and MPI, using

15         them as mere conduits for his worldwide real estate development pursuits.

16    c.  Lovett profited from sales of condominium units in the Millennium Tower and

17         benefitted from the success of the Millennium Tower in his other business

18         ventures.

19    d.  Lovett controlled and dominated MSD, MSH, MPM, MP LLC, and MPI

20         when making crucial decisions about the development, construction, and

21         management of the Millennium Tower.

22    e.  Lovett disregarded the formal distinctions between MSD, MSH, MPM, MP

23         LLC, and MPI treating them as the same.  For example, "Millennium

24

---

25   [33] Millennium Partners, http://millenniumptrs.com (last visited March 28, 2017).

26   [34] Millennium Tower San Francisco Sales Manual, Book 1, Oct. 2007.

27   [35] Email from David Goben to Stephanie Kay-Foss regarding Preliminary Budget Comments (Feb. 28, 2013).

28   [36] Jennifer Frey, *Striking It Ritz; For the, er, Richly Deserving, a Not-So-Humble Abode*, Wash. Post, Aug. 24, 1999.

1    Partners" was the recipient of invoices for construction and other

2    professional services completed at the Millennium Tower by various

3    firms.[37]  Steven Hood (an employee of Millennium Partners) and Sean

4    Jeffries sent correspondence related to the Millennium Tower on behalf of

5    the Millennium Defendants and on "Millennium Partners" letterhead. [38][39]

6    f.   The assets of MSD, MSH, MPM, MP LLC, and MPI were commingled in

7    the development of the Millennium Tower.  Lovett was involved in this

8    commingling of assets and diverted the income and assets of the various

9    entities without regard to the corporate form.

10    g.   Lovett shares his attorney with the Millennium Defendants.

11    h.   Lovett has benefited from the development, construction, and sale of the

12    Millennium Tower such that it would be unjust if he were to escape liability

13    for obligations associated with these benefits by adhering to the fiction that

14    MSD, MSH, MPM, MP LLC, and MPI each have a separate corporate

15    existence.  Modelling subsequent developments on the San Francisco

16    Millennium Tower, Lovett has benefited from Millennium Partners' reputation

17    as a national leader in luxury living.  Without the "impressive portfolio across

18    the nation," including the Millennium Tower San Francisco, Lovett could not

19    have drawn on this powerful branding to advertise their latest project, the

20    Millennium Tower in Boston.[40]  Accolades include the San Francisco Chamber

21    of Commerce's "Excellence in Business—Building San Francisco" Award,

22    which was accepted by Managing Director Baumert.[41]  In establishing a brand

---

[37] J&C Fuentes Invoice (May 21, 2010); Architectural Energy Corp. Invoice (April 30, 2010); McMillan Companies Invoice (May 6, 2010).

[38] Letter from Steven Hood to Kenneth Klein at Simpson Gumpertz & Heger (June 8, 2009).

[39] Letter from Sean Jeffries to Jeff Peters (Feb. 28, 2014).

[40] Upscale Living Magazine, Home/Real Estate/Millennium Boston Tower (2017), http://upscalelivingmag.com/millennium-boston-tower/.

[41] Business Wire, *Millennium Tower Honored at Excellence in Business Awards (Dec. 8, 2010)*, http://www.businesswire.com/news/home/20101208006994/en/Millennium-Tower-Honored-Excellence-Business-Awards.

and a logo based on "Millennium Partners," which is identified with him personally, Lovett personally benefitted from the Millennium Tower and related projects.  But in order to draw upon the power of this national brand, Lovett must be required to take responsibility for the flaws in his various developments.

      i.   Despite having promoted and marketed the Tower as the work of the "Millennium Partners" before the building's defects were discovered, when employees and agents working for both MSD and other Millennium Defendants first learned of the Tower's excessive sinking as early as 2007, and then again when the problems grew increasing drastic after 2009, these employees and agents of MSD and the Millennium Defendants took steps in bad faith to erase the involvement of the other Millennium Defendants and the "Millennium Partners" in the Tower's development after the fact, both to isolate the liability for a potential lawsuit to MSD and to avoid paying the full cost of an extraordinarily expensive repair of the Tower's foundation.  On information and belief, Philip Lovett was involved in these bad faith efforts to contain any liability associated with the Towers' defects to MSD, despite knowing that MSD would not have sufficient assets to remedy the Tower's defective foundation.  The Millennium Defendants, at the direction of the Millennium Founders, also consciously decided to avoid making adequate disclosures to the HOA, residents, or prospective residents, about the sinking and tilting to minimize their liability.

### 2. Millennium Defendants

54. As an alternative to the theory of single enterprise liability alleged against the Millennium Defendants alleged in section IV.A.1 *supra*, the HOA alleges that the Millennium Defendants are secondarily liable based on the following alter ego theory of secondary liability.

55. MPI is liable for the conduct of MSD, MSH, MPM, and MP LLC alleged

herein because each of these four entities were and are the alter egos that MPI used for the purpose of the Millennium Tower project.  Each of MSD, MSH, MPM, and MP LLC were at all relevant times the alter egos of MPI, because a unity of interest and ownership existed between each of MSD, MSH, MPM, MP LLC, on the one hand, and MPI on the other hand, and adherence to the fiction of separate corporate existence would promote injustice under these circumstances.  MPI's alter ego liability is based on at least the following factual allegations:

a.  MSD, MSH, MPM, and MP LLC existed as mere conduits or shell corporations for the interests and manipulations of MPI.

b.  MPI dominated and controlled the affairs of MSD, MSH, MPM and MP LLC, using them as mere conduits for its worldwide real estate development pursuits.

c.  MPI profited from sales of condominium units in the Millennium Tower and benefitted from the success of the Millennium Tower in its other business ventures.

d.  MPI controlled and dominated MSD, MSH, MPM, and MP LLC and made crucial decisions about the development, construction, and management of the Millennium Tower.

e.  MPI disregarded the formal distinctions between MSD, MSH, MPM, and MP LLC, treating them as the same.

f.  MSD, MSH, MPM, MP LLC, and MPI all share a business address at 1995 Broadway, New York, New York.  MSD, MSH, MPM, MP LLC, and MPI also share a common website and use a common logo and brand.

g.  The assets of MSD, MSH, MPM, MP LLC, and MPI were commingled in the development of the Millennium Tower.  MPI was involved in this commingling of assets and diverted the income and assets of the various entities without regard to the corporate form.

h.  MSD, MSH, MPM, MP LLC, and MPI share employees and executives.

1    For instance, Richard Baumert, identified as a Managing Partner of

2    Millennium Boston on the Millennium Partners website,[42] also signed the

3    First Addendum to the Residential Purchase Agreement as Vice-President

4    of Mission Street Holdings, LLC.[43]  Other correspondence identifies him

5    as an employee of Millennium Partners LLC.[44]  The overlapping structure

6    of employment and control confused business associates as well: Steven

7    Hood is sometimes addressed as affiliated with "Millennium Partners" and

8    other times with "Mission Street Development."[45]  MPI's officers and

9    shareholders themselves work for and have various positions at MSD,

10   MSH, MPM, and MP LLC.

11   i.    MSD, MSH, MPM, MP LLC, and MPI also share attorneys.  In this action

12         and other litigation relating to the sinking and tilting of the Millennium

13         Tower, Peter Meier and Paul Hastings LLP represent MPI, MSD, MSH,

14         MP LLC, MPM, the Millennium Founders, Sean Jeffries, and John

15         Luciano.

16   j.    MSD, MSH, MPM, and MP LLC were and are undercapitalized and

17         potentially incapable of satisfying a judgment should the HOA prevail in

18         this action.  In particular, on information and belief, none of MSD, MSH,

19         MPM, or MP LLC has sufficient assets or is insured sufficiently to cover

20         the HOA's alleged damages.

21   k.   MPI has benefited from the development, construction, and sale of the

22         Millennium Tower; it would be unjust if it were to escape liability for

23         obligations associated with these benefits by adhering to the fiction that

---

[42] Millennium Partners, http://millenniumptrs.com (last visited March 28, 2017).

[43] First Addendum to the Residential Purchase Agreement (March 20, 2012) (for Buyers Richard and Jo-Tung Tu Chang).

[44] Letter from Shirley Cui to Richard Baumert (Oct. 27, 2009).

[45] Letter from Brian Dykes (TJPA) to Steven Hood (Mission Street Development) (Jan. 8, 2013); Letter from Ramin Golesorkhi and Joseph E. Romano (Langan Treadwell Rollo) to Steven Hood (Millennium Partners) (Sept. 6, 2016).

FIFTH AMENDED COMPLAINT

MSD, MSH, MPM, and MP LLC each have a separate corporate existence. Modelling subsequent developments on the San Francisco Millennium Tower, MPI has benefited from its reputation as national leaders in luxury living. Without its "impressive portfolio across the nation," including the Millennium Tower San Francisco, MPI could not have drawn on this powerful branding to advertise its latest project, the Millennium Tower in Boston.[46] Accolades include the San Francisco Chamber of Commerce's "Excellence in Business—Building San Francisco" Award, which was accepted by Managing Director Baumert.[47] In establishing a brand and a logo based on "Millennium Partners," MPI benefitted from the Millennium Tower and related projects.

56.     Alternatively, MSH is liable for the conduct of MSD alleged herein because MSD was and is the alter ego that MSH used for the purpose of the Millennium Tower project. MSD was at all relevant times the alter ego of MSH. A unity of interest and ownership existed between each MSD and MSH adherence to the fiction of separate corporate existence would promote injustice under these circumstances. MSH's alter ego liability is based on at least the following factual allegations: MSH dominated and controlled MSD; MSH directly owns at least some of MSD's stock; MSD was a mere shell and conduit for MSH's affairs, MSD was inadequately capitalized; MSD failed to abide by the formalities of the corporate existence; recognizing the separate existence of MSD would promote injustice under the circumstances.

57.     Alternatively, MP LLC is liable for the conduct of MSD, MSH and MPM alleged herein because each of these three entities were and are the alter egos that MP LLC used for the purpose of the Millennium Tower project. Each of MSD, MSH, and MPM were

---

[46] Upscale Living Magazine, Home/Real Estate/Millennium Boston Tower (2017), http://upscalelivingmag.com/millennium-boston-tower/.

[47] Business Wire, *Millennium Tower Honored at Excellence in Business Awards (Dec. 8, 2010),* http://www.businesswire.com/news/home/20101208006994/en/Millennium-Tower-Honored-Excellence-Business-Awards.

1  at all relevant times the alter egos of MP LLC, because a unity of interest and ownership

2  existed between each of MSD, MSH, MPM, on the one hand, and MP LLC, on the other

3  hand, and adherence to the fiction of separate corporate existence would promote injustice

4  under these circumstances.  MP LLC's alter ego liability is based on at least the following

5  factual allegations:  MP LLC dominated and controlled MSD, MSH and MPM; MP LLC

6  indirectly owns a least some of MSD, MSH and MPM's stock; MSD, MSH and MPM were

7  mere shells and conduits for MP LLC's affairs; MSD, MSH and MPM were inadequately

8  capitalized; MSD, MSH and MPM failed to abide by the formalities of the corporate

9  existence; and recognizing the separate existence of MSD, MSH and MPM would promote

10  injustice under the circumstances.

11  58.  Alternatively, MPM is liable for the conduct of MSD and MSH  alleged herein

12  because each of these entities were and are the alter egos that MPM used for the purpose of

13  the Millennium Tower project.  Both MSD and MSH, were at all relevant times the alter egos

14  of MPM, because a unity of interest and ownership existed between each of MSD and MSH,

15  on the one hand, and MPM, on the other hand, and adherence to the fiction of separate

16  corporate existence would promote injustice under these circumstances.  MPM's alter ego

17  liability of the is based on at least the following factual allegations:  MPM dominated and

18  controlled MSD and MSH; MPM indirectly owns at least some of MSD and MSH's stock;

19  MSD, and MSH were mere shells and conduits for MPM's affairs; MSD and MSH were

20  inadequately capitalized; MSD and MSH failed to abide by the formalities of the corporate

21  existence; and recognizing the separate existence of MSD and MSH would promote injustice

22  under the circumstances.

23  **C.  Principal Agent Liability**

24  **1.  Millennium Defendants**

25  59.  As an alternative to the theories of single enterprise and alter ego liability

26  alleged in sections IV.A.1 and IV.B.2 *supra*, the HOA alleges that the Millennium Defendants

27  are secondarily liable based on the following principal-agent theory of secondary liability.

28  60.  MPI was the principal and MSD was the agent in a principal-agent relationship

1  with respect to the development of the Millennium Tower.  MPI represented that MSD would

2  act for MPI in connection with MSD's activities developing the Millennium Tower by

3  allowing MSD to take actions on behalf of MP or Millennium Partners, both of which were

4  used to refer to MPI.  MPI so controlled MSD as to cause MSD to become merely the agent

5  of MPI.  MPI had the right to control and supervise the activities of MSD with respect to the

6  development of the Millennium Tower, including control over the day-to-day operations of

7  MSD with respect to the development of the Millennium Tower.  MSD accepted that it would

8  be the agent of MPI and understood that it would be controlled by MPI for the purpose of the

9  Millennium Tower's development.  The scope of MPI's atypical control over MSD is

10  demonstrated by the factual allegations in paragraph 55, *supra*.

11        61.        MPI was the principal and MSH was the agent in a principal-agent relationship

12  with respect to the development of the Millennium Tower.  MPI represented that MSH would

13  act for MPI in connection with MSH's activities developing the Millennium Tower by

14  allowing MSH to take actions on behalf of MP of Millennium Partners, both of which refer to

15  MPI.  MPI so controlled MSH as to cause MSH to become merely the agent of MPI.  MPI

16  had the right to control and supervise the activities of MSH with respect to the development

17  of the Millennium Tower, including control over the day-to-day operations of MSH with

18  respect to the development of the Millennium Tower.  MSH accepted that it would be the

19  agent of MPI and understood that it would be controlled by MPI for the purpose of the

20  Millennium Tower's development.  The scope of MPI's atypical control over MSH is

21  demonstrated by the factual allegations in paragraph 55, *supra*.

22        62.        MPI was the principal and MP LLC was the agent in a principal-agent

23  relationship with respect to the development of the Millennium Tower.  MPI represented that

24  MP LLC would act for MPI in connection with MP LLC's activities developing the

25  Millennium Tower by allowing MP LLC to take actions on behalf of MP of Millennium

26  Partners, both of which refer to MPI.  MPI so controlled MP LLC as to cause MP LLC to

27  become merely the agent of MPI.  MPI had the right to control and supervise the activities of

28  MP LLC with respect to the development of the Millennium Tower, including control over

1   the day-to-day operations of MP LLC with respect to the development of the Millennium

2   Tower.  MP LLC accepted that it would be the agent of MPI and understood that it would be

3   controlled by MPI for the purpose of the Millennium Tower's development.  The scope of

4   MPI's atypical control over MP LLC is demonstrated by the factual allegations in paragraph

5   55, *supra*.

6           63.     MPI was the principal and MPM was the agent in a principal-agent

7   relationship with respect to the development of the Millennium Tower.  MPI represented that

8   MPM would act for MPI in connection with MPM's activities developing the Millennium

9   Tower by allowed MPM to take actions on behalf of MP of Millennium Partners, both of

10  which refer to MPI.  MPI so controlled MPM as to cause MPM to become merely the agent of

11  MPI.  MPI had the right to control and supervise the activities of MPM with respect to the

12  development of the Millennium Tower, including control over the day-to-day operations of

13  MPM with respect to the development of the Millennium Tower.  MPM accepted that it

14  would be the agent of MPI and understood that it would be controlled by MPI for the purpose

15  of the Millennium Tower's development.  The scope of MPI's atypical control over MPM is

16  demonstrated by the factual allegations in paragraph 55, *supra*.

17          64.     Alternatively, MP LLC was the principal and MSD was the agent in a

18  principal-agent relationship with respect to the development of the Millennium Tower.  MP

19  LLC so controlled MSD as to cause MSD to become merely the agent of MP LLC.  MP LLC

20  had the right to control and supervise the activities of MSD with respect to the development

21  of the Millennium Tower, including control over the day-to-day operations of MSD with

22  respect to the development of the Millennium Tower.  The scope of MP LLC's atypical

23  control over MSD is demonstrated by the factual allegations in paragraph 57, *supra*.

24          65.     Alternatively, MP LLC was the principal and MSH was the agent in a

25  principal-agent relationship with respect to the development of the Millennium Tower.  MP

26  LLC so controlled MSH as to cause MSH to become merely the agent of MP LLC.  MP LLC

27  had the right to control and supervise the activities of MSH with respect to the development

28  of the Millennium Tower, including control over the day-to-day operations of MSH with

1   respect to the development of the Millennium Tower.  The scope of MP LLC's atypical

2   control over MSH is demonstrated by the factual allegations in paragraph 57, *supra*.

3         66.    Alternatively, MP LLC was the principal and MPM was the agent in a

4   principal-agent relationship with respect to the development of the Millennium Tower.  MP

5   LLC so controlled MPM as to cause MPM to become merely the agent of MP LLC.  MP LLC

6   had the right to control and supervise the activities of MPM with respect to the development

7   of the Millennium Tower, including control over the day-to-day operations of MPM with

8   respect to the development of the Millennium Tower.  The scope of MP LLC's atypical

9   control over MPM is demonstrated by the factual allegations in paragraph 57, *supra*.

10         67.    Alternatively, MPM was the principal and MSD was the agent in a principal-

11   agent relationship with respect to the development of the Millennium Tower.  MPM so

12   controlled MSD as to cause MSD to become merely the agent of MPM.  MPM had the right

13   to control and supervise the activities of MSD with respect to the development of the

14   Millennium Tower, including control over the day-to-day operations of MSD with respect to

15   the development of the Millennium Tower.  The scope of MPM's atypical control over MSD

16   is demonstrated by the factual allegations in paragraph 58, *supra*.

17         68.    Alternatively, MPM was the principal and MSH was the agent in a principal-

18   agent relationship with respect to the development of the Millennium Tower.  MPM so

19   controlled MSH as to cause MSH to become merely the agent of MPM.  MPM had the right

20   to control and supervise the activities of MSH with respect to the development of the

21   Millennium Tower, including control over the day-to-day operations of MSH with respect to

22   the development of the Millennium Tower.  The scope of MPM's atypical control over MSH

23   is demonstrated by the factual allegations in paragraph 58, *supra*.

24         69.    Alternatively, MSH was the principal and MSD was the agent in a principal-

25   agent relationship with respect to the development of the Millennium Tower.  MSH so

26   controlled MSD as to cause MSD to become merely the agent of MSH.  MSH had the right to

27   control and supervise the activities of MSD with respect to the development of the

28   Millennium Tower, including control over the day-to-day operations of MSD with respect to

the development of the Millennium Tower.  The scope of MSH's atypical control over MSD is demonstrated by the factual allegations in paragraph 56, *supra*.

## V.    JURISDICTION AND VENUE

70.    Jurisdiction over this action in the Superior Court of the State of California in and for the County of San Francisco is proper pursuant to California Code of Civil Procedure section 410.10 because all Defendants have sufficient minimum contacts with California to support the exercise of jurisdiction.

71.    Venue is proper in the Superior Court of the State of California pursuant to California Code of Civil Procedure section 392 because the real property that is the subject of the action is located in the City and County of San Francisco.  Venue is also proper pursuant to California Code of Civil Procedure section 395.5 because this is the county where some Defendants reside, and pursuant to California Code of Civil Procedure section 395.5 because this county is where the corporate defendant entities' relevant contracts were entered into and performed, and where the relevant obligations and liabilities arose.

## VI.    EASEMENT AGREEMENTS AND FEIR

72.    The TJPA owns real property adjacent to the Property and is in the process of building a new transit terminal that will include an above-ground bus station and a below-ground rail station.  It entered into an Easement Agreement with MSD on October 10, 2008, which was authorized by the TJPA Board of Directors on October 17, 2008, and recorded in the official records of the City and County of San Francisco on March 25, 2009, Document no. 2009-I739852-00 (the "Easement Agreement").

73.    The TJPA then entered into the First Amendment to the Easement Agreement with MSD and the HOA on September 1, 2011, which was recorded in the official records of the City and County of San Francisco on November 3, 2011, Document no. 2011-J296169-00 (the "Amended Easement Agreement").

74.    Under the terms of the Easement Agreement, at Section II.A.1(a), the TJPA covenanted and agreed to design and construct the Support System (lateral and subjacent support for the Property) and the Transit Center to stabilize the soil beneath the Millennium

Tower, prevent the material movement and/or settlement of the Millennium Tower, and provide for the structural support, integrity, and safety of the Millennium Tower during and after the TJPA's construction of the Transit Center.

75.     The TJPA, at Section II.A.1.(b) of the Easement Agreement, agreed that it has the full, complete, and exclusive responsibility for the support, integrity, and safety of the Millennium Tower to the extent the Millennium Tower is affected by the construction of the Transit Center and Support System.

76.     Under Section II.B.1(h) of the Easement Agreement, the TJPA agreed to repair, at its own cost and expense, or pay the reasonable cost of repairing, any damage to the Millennium Tower substantially caused by the TJPA's construction activities.  The TJPA specifically acknowledged that its obligation to repair damage to the Millennium Tower substantially caused by the TJPA's construction activities is not dependent on the existence of fault or negligence on the TJPA's part.  In particular, but not exclusively, the TJPA agreed to repair damage to waterproofing or cracks in the foundations or walls of the Millennium Tower resulting from settlement or movement substantially caused by its construction activities.

77.     Pursuant to the California Environmental Quality Act ("CEQA") and in light of the size and scope of the Transit Center, a Final Environmental Impact Report ("FEIR") was prepared for the Transit Center in 2004.

78.     As lead agency for the Transit Center under CEQA, TJPA prepared and subsequently certified the FEIR.

79.     On April 22, 2004, TJPA adopted its Resolution No. 04-004, approving the Transit Center and adopting CEQA findings, a Statement of Overriding Considerations, and a Mitigation Monitoring and Reporting Program for the Transit Center under CEQA.  As required by CEQA, TJPA found that the Mitigation Monitoring and Reporting Program set forth enforceable mitigation measures, the implementation of which would reduce or avoid potentially significant environmental consequences of the Transit Center.

80.     TJPA has subsequently adopted several addenda to the FEIR, determining in

each case that modifications to the Transit Center would not require subsequent

environmental review and would not require major revisions to the FEIR.

81.     On information and belief, TJPA incorporated the Mitigation Measures as

enforceable components of the Transit Center Project in its Resolution No. 04-004, as

required under CEQA.

82.     The substantive undertakings and obligations of the mitigation measures

required for the Transit Center, specifically Mitigation Measure SG 1, required TJPA to

"[m]onitor adjacent buildings for movement, and if movement is detected, take immediate

action to control the movement."  Mitigation Monitoring and Reporting Program, Rev. 1, 29

NOV07 at Mitigation Measure SG 1.  The Mitigation Monitoring and Reporting Program

requires TJPA to enforce such monitoring and corrective action by requiring the same to be

included in contract documents and to "inspect contractors' activities to ensure compliance."

*Id.*

83.     Similarly, in Mitigation Measure SG 4, TJPA undertook to "[u]nderpin … to

protect existing structures from potential damage that could result from excessive ground

movements during construction."  *Id.* at Mitigation Measure SG 4.

84.     In Mitigation Measure SG 5, TJPA undertook to "assure proper design and

construction of pile-supported foundations for structures to control potential settlement of the

surface."  Mitigation Measure SG 5 also stated that "[s]tability of excavations and resultant

impacts on adjacent structures can be controlled within tolerable limits by proper design and

implementation of the excavation shoring systems."  *Id.* at Mitigation Measure SG 5.

85.     After it began construction of the Transit Center, TJPA—through Arup—

detected movement of the Tower that exceeded both "action trigger levels" and the

"maximum allowable movement" that TJPA was required to set and which it promised not to

exceed, but TJPA ignored its obligations under the FEIR and related construction

specifications, refusing to take any action to control the movement of the Tower, and to

prevent resulting impacts on the Tower.  Instead, TJPA continued with the construction

activities that, on information and belief, it knew and knows now are causing movement of

the Tower.

86.     The undertakings and obligations of the Mitigation Measures and the Mitigation Monitoring Report Program were officially recognized and relied upon by TJPA to ostensibly and allegedly avoid causing significant environmental impacts in connection with construction of the Transit Center.  When TJPA undertook those obligations, it was aware of the Tower's plans and designs.

87.     TJPA has not completed construction of the Transit Center, and its obligations to comply with the Mitigation Measures are continuing obligations.

88.     Despite the mandate to implement and enforce CEQA mitigation measures, no enforcement obligations have been undertaken to date by TJPA to effectively avoid the significant impacts identified in the FEIR.  To the contrary, TJPA has breached its obligations under the FEIR.

89.     The HOA is the successor in interest to MSD under the Easement Agreement. On or about August 23, 2016, the HOA gave notice to the TJPA of the HOA's claims against the TJPA for damages to the extent required under Government Code section 910 *et seq.*  The TJPA denied the HOA's claims on or about October 7, 2016.

## VII.   THE DEFECTS

90.     The Tower was constructed on an inadequate foundation system and has experienced vertical displacement of over 16 inches.  The Tower has settled differentially and is out of plumb by over 12 inches.  The Property also suffers from other defects, including inadequate garage construction and waterproofing, defective windows, curtain wall corrosion and water intrusion, inter-unit odor transmission, cracks, and alignment issues.

91.     The following list of defects as defined in the California Civil Code is preliminary and nonexclusive and, therefore, is given without prejudice to the HOA's right to expand, amend, modify, or augment its claims and/or list of defects at any time, and the HOA specifically reserves its right to do so herein:

  a.  Civil Code § 896(a)(2):  Water intrusion through windows and their systems and assemblies, including without limitation assemblies,

thresholds, framing, substrate, flashings and trim, if any, or their designed
or actual moisture barriers, including without limitation, internal barriers
within the systems themselves.  Such deficiencies have led to water
intrusion into framing cavities and/or unit interiors, causing degradation of
materials.

b.   Civil Code § 896(a)(7): Water intrusion through foundation system and
slabs.  The deficiencies have led to water intrusion into adjacent systems,
including the Garage and basement areas in the Tower and Podium, causing
staining and degradation of materials.

c.   Civil Code § 896(a)(14): Plumbing systems leak.  These deficiencies have
led to water intrusion, staining, corrosion, and efflorescence, and
degradation of other building components.

d.   Civil Code § 896(b)(1): Foundations, load-bearing walls, and slabs are
experiencing vertical and horizontal displacement due to underlying soil
settlement and inadequate foundation support, resulting in damage to
Garage walls, foundation walls, plumbing lines, sidewalks, and other
component parts of the Property.  The foundations of the Tower and
Podium are experiencing settlement at a rate and depth well beyond the
design parameters, resulting in actual or potential cracking of walls, pipes,
joints, sidewalks, and other elements of the Property, water intrusion, and
improper sewer pipe flows.

e.   Civil Code § 896(b)(2): Foundations, load-bearing walls, and slabs contain
significant vertical and horizontal displacement that has the potential to
cause the Property to be structurally unsafe.  The foundations of the Tower
and Podium are experiencing settlement at a rate and depth well beyond the
design parameters, resulting in differential settlement of the Tower and
Podium structures.

f.   Civil Code § 896(b)(4): The Tower was not constructed in material

40

1    compliance with the design criteria for earthquake and wind load

2    resistance, as set forth in the applicable government building codes,

3    regulations, and ordinances in effect at the time of original construction.

4    g.  Civil Code § 896(c)(1): Soils and engineered foundation walls are causing

5    significant vertical and horizontal displacement of the Tower, Podium, and

6    Garage structures due to underlying soil settlement and/or inadequate

7    foundation support, resulting in damage to garage walls, foundation walls,

8    plumbing lines, and other component parts.  The soil underlying the

9    Property is experiencing settlement at a rate and depth well beyond the

10   design parameters, resulting in cracking and water intrusion in the walls

11   and on the lower floor of the Garage, and spalling (or scaling) of the

12   concrete therein.  In the Garage there is water intrusion through subgrade

13   walls and the lower-level garage floor surface, and cracking and spalling of

14   subgrade walls.  In the Tower there is water intrusion through subgrade

15   walls.

16   h.  Civil Code § 896(c)(3): Soil settlement under the Millennium Tower is

17   causing the land to become potentially unusable for its common purpose.

18   i.  Civil Code § 896(g)(2): Cracks and separations have developed in the

19   exterior wall finishes.  The exterior curtain wall is leaking.

20   j.  Civil Code § 896(g)(3)(A): Manufactured window components have been

21   improperly manufactured and/or installed so as to interfere with their

22   useful life.  In particular, window stay arms do not operate properly and are

23   failing.

24   k.  Civil Code § 896(g)(6): There is unreasonable noise and odor transmission

25   between units.

26   l.  Civil Code § 896(g)(15): The foregoing deficiencies violate the standard

27   that structures shall not be constructed in a manner that potentially impairs

28   their occupants' safety.

FIFTH AMENDED COMPLAINT

m.  Civil Code § 897: The foregoing deficiencies violate the standard that other

deficiencies are actionable if they are the cause of damage.

**A.   Compliance with RORA**

92.   On or about August 12, 2016, the HOA provided notice to the Millennium

Defendants, the Millennium Founders, and Webcor of the HOA's claim under California

Civil Code section 6000 *et seq.* and sections 896 and 910 *et seq.* for damages arising out of, or

related to, deficiencies in the development, design, specifications, planning, supervision,

testing, observation of construction, and construction of the Property.  The notice tolled all

applicable statutes of limitation and repose, whether in contract, statute, or decisional law, by

and against all potentially responsible parties, regardless of whether they were named in the

notice, including claims for indemnity, consistent with California Civil Code section 6000,

section 895 *et seq.*, and section 910 *et seq.* (and including Civil Code section 927).  Since that

date, the HOA, Millennium Defendants, the Millennium Founders, Webcor, and certain others

have been engaged in the dispute resolution process identified in the statutes above.

93.   The HOA complied with all pre-litigation procedures required under the Right

to Repair Action ("RORA"), California Civil Code sections 895 *et seq.*, with respect to all

defendants who the HOA alleges are "builders" pursuant to RORA section 911, which

includes all of the Millennium Defendants, and all defendants who are alleged to be

secondarily liable for the activities of the "builders," which includes the Millennium

Founders.  The Millennium Founders are individuals who are liable for the activities of the

"builders" via secondarily liability as a result of their relationship with the Millennium

Defendants.  The document providing notice was transmitted to counsel representing the

Millennium Defendants, the Millennium Founders, and Webcor on or about August 12, 2016

and provided adequate notice (actual or constructive) of the HOA's claims under California

Civil Code section 6000 *et seq.* and sections 896 and 910 *et seq.* to the Millennium

Defendants, the Millennium Founders, and Webcor.

94.   The HOA's compliance with the prelitigation requirements of RORA was

effective as to all Millennium Defendants and the Millennium Founders because:

42

a.   The HOA provided actual notice to counsel for the Millennium Defendants and the Millennium Founders and complied with all other RORA prelitigation requirements under California Civil Code section 6000 *et seq.* and sections 896 and 910 *et seq.*

b.   Alternatively, the HOA substantially complied with all of the pre-litigation requirements of RORA for all of the Millennium Defendants and the Millennium Founders.  The HOA's notice and the subsequent prelitigation process provided all of the Millennium Defendants and the Millennium Founders with an opportunity to repair the Millennium Tower, and did not prejudice the rights of any of the Millennium Defendants and the Millennium Founders under RORA.

c.   Alternatively, the HOA's compliance with all of the pre-litigation requirements of RORA was constructive as to the Millennium Defendants and the Millennium Founders except MSD (for which compliance is undisputed) because MSD is the alter ego of each of MSH, MPM, MP LLC, MPI, and the Millennium Founders and notice to the alter ego provided notice to the controlling individuals and entities.

d.   Alternatively, the HOA's compliance with all of the pre-litigation requirements of RORA is deemed satisfied because the Millennium Defendants and the Millennium Founders concealed the true identities of certain entities considered "builders" under RORA and led the HOA to believe that MSD was the only "builder" under RORA.  At the time the pre-litigation notice was provided to counsel for all Millennium Defendants and the Millennium Founders, the HOA was unaware of the true identities of all of the "builders" under RORA but still provided actual written notice to the attorneys representing all Millennium Defendants and the Millennium Founders.  Subsequently, in preparing

43

1        to file this lawsuit, the HOA conducted further investigations and

2        learned the true identities of parties that are also "builders" under

3        RORA and named those entities in the complaint.

4            e.   Alternatively, requiring further notice or prelitigation procedures under

5        RORA by the HOA would be futile and would not serve the object and

6        purpose of RORA because MSH, MPM, MP LLC, MPI and the

7        Millennium Founders all contend that they do not meet the definition of

8        "builders," who are the only entities entitled to the protections of the

9        prelitigation procedures.

10       95.    Alternatively, the HOA is released from the requirements of the prelitigation

11   procedures of RORA as to MSH, MPM, MP LLC, MPI, and the Millennium Founders

12   pursuant to civil code section 911 of RORA because the name and address of the agent for

13   notice for each of MSH, MPM, MP LLC, MPI, and the Millennium Founders was not

14   included in the original sales documentation or provided to the Secretary of State.

15       96.    California civil code section 911(e) states: "[a] builder shall maintain the name

16   and address of an agent for notice pursuant to this chapter with the Secretary of State or,

17   alternatively, elect to use a third party for that notice if the builder has notified the homeowner

18   in writing of the third party's name and address, to whom claims and requests for information

19   under this section may be mailed.  The name and address of the agent for notice or third party

20   shall be included with the original sales documentation and shall be initialed and

21   acknowledged by the purchaser and the builder's sales representative."

22       97.    California civil code section 911(i) states: "[a]ny builder who fails to comply

23   with any of these requirements within the time specified is not entitled to the protection of this

24   chapter, and the homeowner is released from the requirements of this chapter and may

25   proceed with the filing of an action, in which case the remaining chapters of this part shall

26   continue to apply to the action."

27       98.    Because MSH, MPM, MP LLC, and MPI are "builders" under RORA and the

28   Millennium Founders are individuals who are liable for the activities of the "builders" via

1  secondarily liability; and because these entities and individuals failed to comply with the

2  requirements of section 911(e), "the [HOA] is released from the requirements of [the RORA

3  pre-litigation procedures] and may proceed with the filing of an action . . ." under section

4  911(i).

5

6  ## VIII.   CAUSES OF ACTION

7  ### FIRST CAUSE OF ACTION

8  **Violation of California Civil Code § 895 *et seq.* Against the**

9  **Millennium Defendants (all directly liable and, alternatively, secondarily liable based on**

10  **theories described in §IV), Millennium Founders (all secondary liable based on theories**

11  **described in §IV), Webcor (directly liable), Handel (directly liable), the Engineering**

12  **Defendants (all directly liable except Langan, whose liability is based on being the**

13  **successor to Treadwell & Rollo), and Does 1 Through 100, Inclusive**

14  99.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 98

15  above as if fully set forth herein.

16  **A.    Direct Liability**

17  100.    Each of the five Millennium Defendants—MSD, MSH, MPM, MP LLC, and

18  MPI, qualify as "builders" according to the definition provided in section 911(a) of RORA

19  because each entity was in the business of selling residential units in the Tower to the public

20  at the time of the sales of the Millennium Tower's units or, in the alternative, was in the

21  business of building, developing, or constructing the residential units in the Millennium

22  Tower for public purchase.  For example, MSD was a builder because it sold certain of the

23  Tower's residential units to the public.  MPI was a builder because it was involved in the

24  business of developing the Tower's residential units through its marketing efforts on the

25  Millennium Partners website, its participation in the site selection process, its participation in

26  the structural engineering process, and its participation in various other design and

27  engineering efforts.  MPM was a builder because it was in the business of developing the

28  Tower's residential units through its efforts to sell various units in the Tower and its

45

1  participation in the landscaping design process.  MP LLC and MSH were builders because

2  they were in the business of developing the Tower's residential units through their efforts to

3  manage the activities of their agents, including the Millennium Founders, relating to the

4  development of the Millennium Tower.  MSH was also a builder because it participated in the

5  selection of the finishes for the units in the Millennium Tower and managed the process of

6  selling the Tower's units.  Each of the Millennium Founders are alleged to be liable for the

7  activities of the "builders" because each of these three individuals was in the business of

8  selling residential units in the Tower to the public at the time of the sales of the Millennium

9  Tower's units or, in the alternative, was in the business of building, developing, or

10  constructing the residential units in the Millennium Tower for public purchase, through the

11  activities of their alter egos, the Millennium Defendants.

12       101.    All of the Millennium Defendants, Webcor, Handel, and the Engineering

13  Defendants were under a statutory obligation to design, develop, and/or construct the

14  Millennium Tower in conformance with all applicable building codes and standards,

15  including but not limited to California Civil Code section 895 *et seq.*

16       102.    All of the Millennium Defendants failed to develop the Millennium Tower in

17  conformance with the standard of California Civil Code section 895 *et seq.*, specifically the

18  functionality standard set forth in California Civil Code sections 896 and 897.

19       103.    Webcor, Handel, and the Engineering Defendants also failed to design and/or

20  construct the Millennium Tower in conformance with the standard of California Civil Code

21  section 895 *et seq.*, specifically the functionality standard set forth in California Civil Code

22  sections 896 and 897.

23       104.    Webcor, Handel and the Engineering Defendants caused, either in whole or in

24  part, the failure to design, develop, and/or construct the Millennium Tower in conformance

25  with the standards of Civil Code section 895 *et seq.*, as a result of their negligent acts and

26  omissions, as described *infra*.

27       105.    The HOA seeks damages for the reasonable value of repairing any violation of

28  the standards found under California Civil Code section 895 *et seq.*; reasonable costs of

1  repairing any damages caused by repair efforts; reasonable costs of repairing and rectifying

2  any damages resulting from the failure of the Millennium Tower to meet the section 895

3  standards; reasonable costs of removing and replacing any improper repair; reasonable

4  relocation and storage expenses; and reasonable investigative costs for each established

5  violation of the section 895 standards.

6  **B.      Secondary Liability**

7  106.    Alternatively, the Millennium Defendants are secondarily liable for this cause

8  of action pursuant to the theories described in §IV *supra*.

9  107.    The Millennium Founders are secondarily liable for this cause of action

10  pursuant to the theories described in §IV *supra*.

11  108.    Langan is secondarily liable for this cause of action pursuant to the theory

12  described in paragraph 41, *supra*.

13  109.    The Millennium Defendants, the Millennium Founders, Webcor, Handel, the

14  Engineering Defendants, and Does 1 Through 100, Inclusive are all jointly and severally

15  liable for the HOA's damages caused by defendants' violations of Civil Code section 895 *et*

16  *seq*.

17  **<u>SECOND CAUSE OF ACTION</u>**

18  **Negligence Against the Millennium Defendants (all directly liable, all also alternatively**

19  **indirectly liable based on secondary liability theories described in §IV), Millennium**

20  **Founders (all indirectly liable based on secondary liability theories described in §IV),**

21  **Webcor (directly liable), Handel (directly liable), the Engineering Defendants (all**

22  **directly liable except Langan, whose liability is based on being the successor to**

23  **Treadwell & Rollo), ARUP (directly liable), the Salesforce Tower Defendants (directly**

24  **liable), and Does 1 Through 100, Inclusive**

25  110.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 109

26  above as if fully set forth herein.

27  **A.      Direct Liability**

28  111.    Each of the Millennium Defendants were and are a developer who participated

in the process of the design, engineering, manufacture, construction, and management of the structures of the Millennium Tower designated for commercial use and who performed labor, supplied materials, equipment, or services necessary for the building and construction of the Millennium Tower with the knowledge that certain of the Tower's units would be sold to, and used by, members of the public for commercial purposes.

112.    For example, MSD was a developer because it sold or leased certain of the Tower's commercial units.  MPI was a developer because of its marketing efforts on the Millennium Partners website, its participation in the site selection process, its participation in the structural engineering process, and its participation in various other design and engineering efforts relating to the Tower's commercial units.  MPM was a developer because of its efforts to market various commercial units in the Tower and its participation in the landscaping design process.  MP LLC and MSH were developers because of their efforts to manage the activities of their agents, including the Millennium Founders, relating to the development of the Millennium Tower, including its commercial units.  MSH was also a developer because it participated in the selection of the finishes for the commercial units in the Millennium Tower and managed the process of leasing or selling the Tower's commercial units.

113.    Each of the Webcor, Handel, and the Engineering Defendants were and are a contractor, general contractor, subcontractor, supplier, architect, engineer, or other person, entity, or professional who participated in the process of the design, engineering, manufacture, construction, and management of condominium units, buildings, improvements, and structures of the Millennium Tower and who performed labor, supplied materials, equipment, and/or services necessary for the building and construction of the Millennium Tower with the knowledge that the Tower's units would be leased or sold to, and used by, members of the public for both commercial and residential purposes.

114.    In so doing, the Millennium Defendants, Webcor, Handel, and the Engineering Defendants caused the Millennium Tower to be designed, engineered, constructed, and/or managed through their own works of labor, their supplying of materials,

48

1   equipment, and services, and through causing other contractors and subcontractors to perform

2   works of labor to supply materials, equipment, and services in order to properly complete and

3   manage the Millennium Tower and subject structures so that it could be leased or sold and

4   used by members of the public for both commercial and residential purposes.

5        115.   Each of the Millennium Defendants, Webcor, Handel, and the Engineering

6   Defendants negligently, carelessly, tortiously, and wrongfully failed to use reasonable care in

7   the analysis, preparation, design, manufacture, construction, and/or management of the real

8   property and structures of the Millennium Tower, including those aspects to be used for

9   commercial purposes, thereby causing damages, including, among other things, excessive and

10   differential settlement of the Tower and the Podium, and defects and deficiencies in the

11   foundation, Garage, subterranean structure, curtain wall, exterior wall panels, skylights,

12   common areas, plaza and terrace decks, unit interiors (including but not limited to excessive

13   noise and odors moving between units), exterior doors, roofing, and utility connections.

14        116.   For example, MSD failed to use reasonable care in selecting the inadequate

15   foundation system, inadequate garage construction and waterproofing, defective windows,

16   and other structural systems leading to the curtain wall corrosion and water intrusion, inter-

17   unit odor transmission, cracks, and alignment issues.  In addition, each of MSH, MPM, MP

18   LLC and MPI failed to use reasonable case in directing the activities of the Engineering

19   Defendants.

20        117.   Each of the Millennium Defendants, Webcor, Handel, and the Engineering

21   Defendants knew or should have known that if the Millennium Tower was not properly or

22   adequately designed, engineered, supervised, constructed, and/or managed, the owners and

23   commercial users would be substantially damaged thereby, and the condominium units,

24   buildings, improvements, and structures would be defective, including those related to the

25   commercial units.

26        118.   Each of the Millennium Defendants, Webcor, Handel, and the Engineering

27   Defendants were under a duty to exercise ordinary care to avoid reasonably foreseeable injury

28   to users and purchasers of the condominium units, buildings, improvements, and structures,

including those designated for commercial use, and knew or should have foreseen with

reasonable certainty that leasees, purchasers, and/or commercial users would suffer damages

if the Millennium Defendants, Webcor, Handel, and the Engineering Defendants failed to

perform their duty to cause the Property and the structures of the Millennium Tower to be

designed, engineered, constructed, and managed in a proper workmanlike manner and

fashion.

119.    Each of the Millennium Defendants, Webcor, Handel, and the Engineering

Defendants breached their duty to exercise ordinary care.  The Millennium Defendants,

Webcor, Handel, and the Engineering Defendants failed and neglected to perform their work,

labor, and services properly or adequately.  The Millennium Defendants, Webcor, Handel,

and the Engineering Defendants so negligently performed their work, labor, and/or services

such that the premises and structures of the Millennium Tower were designed, engineered,

constructed, and/or managed improperly, negligently, carelessly, and/or not in a workmanlike

manner.

120.    Defendant Arup was hired by the TJPA's architect to provide geotechnical

engineering services relating to the lateral support for the Millennium Tower made necessary

by the excavation for the Transit Center.  Arup performed work, labor, and/or services for the

soils evaluation, support wall, and buttress pile wall between the Transit Center and the

Millennium Tower for the purpose of providing lateral and subjacent support to the

Millennium Tower to limit any sinking caused by the construction of the Transit Center.

121.    Arup was under a duty to exercise ordinary care as engineer, subcontractor,

manager, or otherwise to avoid reasonably foreseeable injury to users and purchasers of the

condominium units, buildings, improvements, and structures of and in the Millennium Tower.

Arup knew or should have foreseen with reasonable certainty that the HOA and its members

would suffer damages if the soils evaluation, support wall, and buttress pile wall were not

properly or adequately designed, engineered, supervised, and/or constructed.

122.    Arup breached its duty to exercise ordinary care.  On information and belief,

the HOA alleges that Arup negligently, carelessly, tortiously, and wrongfully failed to use

reasonable care in the analysis, preparation, design, manufacture, and/or construction of the soils evaluation, lateral support, and/or buttress pile wall, thereby causing damage to the Millennium Tower, including, among other things, excessive and differential settlement of the Tower and Podium, and defects and deficiencies in the Garage.

123.    The Salesforce Tower Defendants were and are the developers, builders, sellers, managers or other entities primarily responsible for the construction of the Salesforce Tower and who performed labor and supplied materials, equipment, and/or services necessary for the construction of the Salesforce Tower.  In so doing, the Salesforce Tower Defendants, in their capacity as developers, builder, sellers, managers, or otherwise, caused the Salesforce Tower to be designed, engineered, constructed, and/or managed through their own works of labor, their supplying of materials, equipment, and services, and through causing other contractors and subcontractors to perform works of labor to supply materials, equipment, and services in order to construct and manage the Salesforce Tower.

124.    The Salesforce Tower Defendants were and are under a duty to exercise ordinary care or otherwise to avoid reasonably foreseeable injury to the HOA and its members.  The Salesforce Tower Defendants knew or should have foreseen with reasonable certainty that the HOA and its members would suffer damages if the Salesforce Tower was not properly or adequately designed, engineered, supervised, and/or constructed.

125.    The Salesforce Tower Defendants breached their duty to exercise ordinary care.  On information and belief, the HOA alleges that the Salesforce Tower Defendants negligently, carelessly, tortiously, and wrongfully failed to use reasonable care in the analysis, preparation, design, and/or construction of the Salesforce Tower, thereby causing damage to the Millennium Tower, including, among other things, excessive and differential settlement of the Tower and Podium, and defects and deficiencies in the Garage.  In particular, the TJPA and the Salesforce Tower defendants acted with conscious disregard of the foreseeable risk of harm that the excavation and dewatering work at the Transit Center and the Salesforce Tower might cause injury to the Millennium Tower by failing to take adequate protective measures to secure, monitor, or otherwise mitigate effects to the Millennium Tower prior to and during

1  the excavation and dewatering work at the Transit Center and the Salesforce Tower.

2      126.    As a direct and proximate result of these breaches, the HOA has suffered and

3  will continue to suffer damages in an amount to be proved at trial.

4      **B.      Secondary Liability**

5      127.    Alternatively, the Millennium Defendants are secondarily liable for this cause

6  of action pursuant to the theories described in §IV *supra*.

7      128.    The Millennium Founders are secondarily liable for this cause of action

8  pursuant to the theories described in §IV *supra*.

9      129.    Langan is secondarily liable for this cause of action pursuant to the theory

10 described in paragraph 41, *supra*.

11     130.    The Millennium Defendants, the Millennium Founders, Webcor, Handel, the

12 Engineering Defendants, ARUP, the Salesforce Tower Defendants, and Does 1 Through 100,

13 Inclusive are all jointly and severally liable for the HOA's damages caused by defendants'

14 negligence.

15                    **THIRD CAUSE OF ACTION**

16 **Breach of Express Warranties Against MSD (directly liable), Millennium Defendants (all**

17     **except MSD secondarily liable based on theories described in §IV), Millennium**

18 **Founders (all secondary liable based on theories described in §IV), and Does 1 Through**

19                        **100, Inclusive**

20     131.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 130

21 above as if fully set forth herein.

22     **A.      Direct Liability**

23     132.    Pursuant to California Civil Code section 5980, the HOA has standing to

24 institute litigation "in its own name as the real party in interest and without joining with it the

25 members, in matters pertaining to the following: . . . (b) Damage to the common area.  (c)

26 Damage to a separate interest that the association is obligated to maintain or repair [or] (d)

27 Damage to a separate interest that arises out of, or is integrally related to, damage to the

28 common area or a separate interest that the association is obligated to maintain or repair."

133.    As a result of California Civil code section 5980, the HOA can bring a cause of action based on a breach of an express warranty provided to a homeowner that relates to damage to the common area of the Millennium Tower, a separate interest of a homeowner that the HOA is obligated to maintain or repair, or a separate interest of a homeowner that arises out of, or is integrally related to, damage to the common area or a separate interest that the association is obligated to maintain or repair. *See Windham at Carmel Mountain Ranch Assn. v. Superior Court*, 109 Cal. App. 4th 1162, 1175 (2003) ("the legislative intent of section [5980] is to give associations the standing to sue as real parties in interest in all types of actions for damage to common areas").

134.    Accordingly, the HOA brings this cause of action based on express warranties made by the seller of the Tower's units (MSD) to the buyer of the Tower's units (homeowners) on which the homeowners reasonably relied and which MSD breached.  These warranties related to the conditions of the common areas, separate interests that the HOA is obligated to maintain or repair, and separate interest that arises out of, or is integrally related to, damage to the common area or a separate interest that the HOA is obligated to maintain or repair.

135.    MSD was a seller of various units in the Millennium Tower to individual homeowners, who are members of the HOA.

136.    MSD expressly warranted to homeowners of units in the Millennium Tower through sales and advertising materials and through sales representatives for the Property that the Millennium Tower was designed and constructed in a commercially reasonable and habitable manner when offering the units of the Millennium Tower for sale to the general public for use as residences.  For instance, the Millennium Tower San Francisco Sales Manual states, "With its superior design, highest quality, thoughtful service, and extraordinary amenities, we believe  Millennium Tower will be the best residential tower ever built in San Francisco."  Sales representatives of MSD provided prospective homeowners with sales materials containing representations about the superior and luxury quality of the building.

137.    The sales representatives who used this sales manual in inducing purchases of

1    the Tower' units were acting on behalf of MSD when doing so, and were acting within the

2    scope of their employment and/or agency relationship with MSD when doing so.

3        138.    These express warranties were made when MSD knew that the building was

4    settling excessively and differentially.

5        139.    Homeowners relied on the express warranties of MSD discussed in paragraph

6    136 *supra* when they purchased condominium units within the Millennium Tower from MSD,

7    believing at the time of sale that a luxury building would, at a minimum, possess a foundation

8    that was not massively defective.

9        140.    The massively defective foundation as well as the other defects described in

10   section VII *supra* fall with the definition of "(b) Damage to the common area.  (c) Damage to

11   a separate interest that the association is obligated to maintain or repair.  [or] (d) Damage to a

12   separate interest that arises out of, or is integrally related to, damage to the common area or a

13   separate interest that the association is obligated to maintain or repair."  Cal. Civ. Code §

14   5980.

15       141.    MSD breached these express warranties by selling the condominium units in

16   the Millennium Tower with the above-described deficiencies in the design, specification,

17   planning, supervision, development, improvement, and repair thereof.

18       142.    As a direct and proximate result of the breach of express warranties by MSD

19   the HOA and its members suffered damages stemming from the excessive and differential

20   settlement of the Tower and Podium structures, and defects and deficiencies in the foundation,

21   Garage, subterranean structure, curtain wall, exterior wall panels, skylights, common areas,

22   plaza and terrace decks, unit interiors (including but not limited to noise and odors moving

23   between units), exterior doors, roofing, and utility connections as set forth herein.

24       **B.    Secondary Liability**

25       143.    The Millennium Defendants other than MSD are secondarily liable for this

26   cause of action pursuant to the theories described in §IV *supra*.

27       144.    The Millennium Founders are secondarily liable for this cause of action

28   pursuant to the theories described in §IV *supra*.

145.     MSD, the remaining Millennium Defendants, the Millennium Founders, and Does 1 through 100, Inclusive are all jointly and severally liable for the HOA's damages caused by defendants' breach of express warranty.

### FOURTH CAUSE OF ACTION

**Breach of Implied Warranties Against MSD (directly liable), Millennium Defendants (all except MSD secondarily liable based on theories described in §IV), Millennium Founders (all secondarily liable based on theories described in §IV), Webcor (directly liable), and Does 1 Through 100, Inclusive**

146.     The HOA re-alleges and incorporates by reference Paragraphs 1 through 145 above as if fully set forth herein.

### A.     Direct Liability

147.     Pursuant to California Civil Code section 5980, the HOA has standing to institute litigation "in its own name as the real party in interest and without joining with it the members, in matters pertaining to the following: . . . (b) Damage to the common area.  (c) Damage to a separate interest that the association is obligated to maintain or repair [or] (d) Damage to a separate interest that arises out of, or is integrally related to, damage to the common area or a separate interest that the association is obligated to maintain or repair."

148.     As a result of California Civil code section 5980, the HOA can bring a cause of action for breach of an implied warranty provided to a homeowner that relates to damage to the common area of the Millennium Tower, a separate interest of a homeowner that the HOA is obligation to maintain or repair, or a separate interest of a homeowner that arises out of, or is integrally related to, damage to the common area or a separate interest that the association is obligated to maintain or repair.  *See Windham at Carmel Mountain Ranch Assn. v. Superior Court*, 109 Cal. App. 4th 1162, 1175 (2003) ("the legislative intent of section [5980] is to give associations the standing to sue as real parties in interest in all types of actions for damage to common areas").

149.     Accordingly, the HOA brings this cause of action based on implied warranties made by the seller of the Tower's units (MSD) and the (Webcor).  These warranties related to

the conditions of the common areas, separate interests that the HOA is obligated to maintain or repair, and separate interest that arises out of, or is integrally related to, damage to the common area or a separate interest that the HOA is obligated to maintain or repair.

150.    MSD was the seller of various units in the Millennium Tower to individual homeowners, who are members of the HOA.

151.    MSD provided prospective buyers with a written statement disclaiming any knowledge of any substantial defects as required by California Civil Code § 1134(b).  This "Property Disclosure and Information Statement," dated May 2011, failed to disclose that the building was experiencing excessive vertical and differential settlement.  This disclosure constituted an implied warranty that no substantial defects existed in the common areas, the separate interests the HOA is obligated to maintain and repair, or the separate interests that are integrally related to the common areas and separate interests.

152.    In addition, Webcor impliedly warranted that the Millennium Tower was designed and constructed in a commercially reasonable and workmanlike manner and consistent with the standards set forth in California civil code sections 895 through 897.

153.    MSD impliedly warranted that the Millennium Tower was designed and constructed in a commercially reasonable and workmanlike manner when MSD offered the condominium units of the Millennium Tower for sale to the general public and delegated the duty of maintenance and repair to the HOA.

154.    The Millennium Tower was not of proper durability, reliability, and/or general quality and not fit for its intended use.

155.    As a direct and proximate result of MSD's and Webcor's breaches, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

156.    Individual homeowners relied on the implied warranties of MSD and Webcor when they purchased condominium units within the Millennium Tower from MSD.

157.    The massively defective foundation as well as the other defects described in section VII supra fall with the definition of "(b) Damage to the common area.  (c) Damage to a separate interest that the association is obligated to maintain or repair.  [or] (d) Damage to a

56

1  separate interest that arises out of, or is integrally related to, damage to the common area or a

2  separate interest that the association is obligated to maintain or repair."  Cal. Civ. Code §

3  5980.

4  **B.   Secondary Liability**

5  158.  The Millennium Defendants other than MSD are secondarily liable for this

6  cause of action pursuant to the theories described in §IV *supra*.

7  159.  The Millennium Founders are secondarily liable for this cause of action

8  pursuant to the theories described in §IV *supra*.

9  160.  MSD, the remaining Millennium Defendants, the Millennium Founders,

10  Webcor, and Does 1 through 100, Inclusive are all jointly and severally liable for the HOA's

11  damages caused by defendants' breach of implied warranty.

12  **<u>FIFTH CAUSE OF ACTION</u>**

13  **Strict Liability Against the Millennium Defendants (all directly liable, all also**

14  **secondarily liable based on theories described in §IV), Millennium Founders (all**

15  **secondarily liable based on theories described in §IV), and Does 1 Through 100,**

16  **Inclusive**

17  161.  The HOA re-alleges and incorporates by reference Paragraphs 1 through 160

18  above as if fully set forth herein.

19  **A.   Direct Liability**

20  162.  All of the Millennium Defendants are, and at all times relevant were, engaged

21  in the mass production of commercial units for lease, sale and/or use by members of the

22  general public.

23  163.  For example, MSD was involved in the production of the Tower's units

24  because it leased or sold certain of the Tower's commercial units to the public.  MPI was

25  involved in the production of the Tower's units because it developed the Tower's commercial

26  units through its marketing efforts on the Millennium Partners website, participated in the site

27  selection process, participated in the structural engineering process, and participated in

28  various other design and engineering efforts.  MPM was involved in the production of the

Tower's commercial units because it leased or sold various units in the Tower and its participated in the landscaping design process.  MP LLC and MSH were involved in the production of the Tower's commercial units because they managed the activities of their agents, including the Millennium Founders, relating to the development of the Millennium Tower.  MSH was also involved in the selection of the finishes for the commercial units in the Millennium Tower and managed the process of selling the Tower's commercial units.

164.    In or about 2005–2013, all of the Millennium Defendants participated in the design, development, construction, marketing, leasing/or and sale of commercial units, buildings, structures, and improvements for the Millennium Tower.  In doing so, all of the Millennium Defendants developed the Millennium Tower with units for commercial use.

165.    In these capacities, all of the Millennium Defendants knew that the condominium units, buildings, and structures would be leased or sold to, and used by, members of the general public for commercial purposes.  All of the Millennium Defendants knew, or reasonably should have known, that the persons who would lease or purchase the commercial units would do so without inspection for the defects set forth herein.

166.    All of the Millennium Defendants impliedly warranted that the real property and structures in the Millennium Tower, including, among other things, the foundation, Garage, subterranean structure, curtain wall, exterior wall panels, skylights, common areas, plaza and terrace decks, unit interiors, exterior doors, roofing, and utility connections, were of merchantable quality and were erected in a reasonable workmanlike manner.

167.    All of the Millennium Defendants are strictly liable and responsible to the HOA for all damages suffered as a result of the defects and deficiencies relating to the Millennium Tower's commercial units, including, among other things, excessive and differential settlement of the Tower and Podium, and defects and deficiencies in the foundation, Garage, subterranean structure, curtain wall, exterior wall panels, skylights, common areas, plaza and terrace decks, unit interiors (including but not limited to excessive odor transfers between units), exterior doors, roofing, and utility connections.

168.    Within the past year, the HOA discovered that the underlying soils and

component structures of the Millennium Tower are, and have been, experiencing defective

conditions, including, among other things, excessive and differential settlement of the Tower

and the Podium, and defects and deficiencies in the foundation, Garage, subterranean

structure, curtain wall, exterior wall panels, skylights, common areas, plaza and terrace decks,

unit interiors (including but not limited to odors moving between units), exterior doors,

roofing, and utility connections.  Such defective components are not of merchantable quality,

nor were they designed, erected, constructed, or installed in a workmanlike manner, but

instead are defective and, as now known, demonstrate improper, nonexistent, and/or

inadequate design, construction, manufacture and/or installation.  The structures may be

additionally defective in ways and to an extent not precisely known, but will be established at

the time of trial according to proof.

169.    The HOA properly notified all of the Millennium Defendants and the

Millennium Founders of the defective conditions of the Millennium Tower.  Notwithstanding

such notice, all of the Millennium Defendants and the Millennium Founders have failed to

acknowledge responsibility for all of the defective conditions or otherwise cause the

appropriate restoration and/or repair to be made at their cost and expense.

170.    The items generally referred to and particularly described herein were latent

deficiencies in that the above-described defects arose out of, were attributable to, and are

directly and proximately caused by the above-described latent deficiencies in the design,

specifications, planning, supervision, construction, observation of construction, development,

and improvement of the Millennium Tower.  Before the HOA discovered them, such defects

and deficiencies could not have been discovered by the exercise of reasonable diligence.

171.    At all times relevant, the HOA relied on the skill of each of the Millennium

Defendants to produce condominiums that are reasonably fit for their intended purpose.

172.    The HOA is still not fully aware of all the causes, the full extent, and possible

legal significance of the results or causes of the conditions described above due to the loss

being continual and latent.  The HOA is an organization of lay individuals who require expert

consultation to provide a review of the property conditions.  The HOA is still not informed of

any causes or entire results of the full extent of these latent deficiencies, nor is the HOA fully

informed of the potential causes of the resultant distress due to the loss being continual and

latent.

173.    Any and all repair attempts by any of the Millennium Defendants failed to

adequately correct the damages and deficiencies in the Millennium Tower thereby resulting in

further property damage.

174.    Instead of causing the necessary and required construction and repair of the

Millennium Tower, all of the Millennium Defendants caused cosmetic, temporary, or

ineffective repairs to be made to various portions of the Millennium Tower for the purpose of

leading the HOA and its members to believe that the Millennium Defendants were resolving

and correcting all deficiencies.  By virtue of such conduct, each of the Millennium Defendants

are estopped to assert that the HOA may not seek the damages herein sought.

175.    The above-described defects arose out of, were attributed to, and are directly

and proximately caused by the above-described deficiencies in the design, specification,

planning, supervision, development, and improvement of the Millennium Tower and faulty

repairs thereto, and before such defects were discovered by the HOA, they could not have

been discovered by the exercise of reasonable diligence.  As a direct and proximate result of

the conduct herein alleged, the HOA has suffered damages in an amount to be proven at the

time of trial.

**B.    Secondary Liability**

176.    Alternatively, the Millennium Defendants are secondarily liable for this cause

of action pursuant to the theories described in §IV *supra*.

177.    The Millennium Founders are secondarily liable for this cause of action

pursuant to the theories described in §IV *supra*.

178.    The Millennium Defendants, the Millennium Founders, and Does 1 through

100, Inclusive are all jointly and severally liable for the HOA's damages for which defendants

are strictly liable.

## SIXTH CAUSE OF ACTION

**Negligent Misrepresentation Against Sean Jeffries (directly liable); Millennium Defendants (all secondarily liable based on agency, respondeat superior, or secondary liability theories described in §IV); and Millennium Founders (all secondarily liable based on theories described in §IV), and Does 1 Through 100, Inclusive**

179.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 178 above as if fully set forth herein.

### A.    Direct Liability

180.    Sean Jeffries represented on February 28, 2014 to the HOA that he was not "aware to date of any information that gives us concern for the safety of the building or any significant impact on the structure."[48] This representation was demonstrably false, which Sean Jeffries knew at the time he made it, as the Tower had already exceeded the revised upper limit of the total expected lifetime settlement.

181.    At the time, Sean Jeffries did not have any reasonable ground for believing his February 28, 2014 representation was true.  As Sean Jeffries was aware, the Tower was originally predicted to sink no more than 4 to 6 inches over its lifetime, and that the predicted lifetime settlement of the Tower was later revised to 10.3 to 12.3 inches.  At the time of his representation on February 28, 2014, Sean Jeffries also knew that the Tower had already exceeded its revised predicted lifetime settlement.  Sean Jeffries also knew that the TJPA's construction activities would likely cause further differential settlement.

182.    Sean Jeffries also made periodic presentations to the HOA at the executive session board meetings where he repeatedly assured the HOA that Millennium Partners was monitoring the building, was not aware of any concerns regarding building settlement, and that any settlement was within normal limits.  Sean Jeffries made these misrepresentations orally to the members of the HOA's executive committee at certain executive board meeting sessions between January 2014 and January 2016.  These meetings took place on or around January 2014, May 2014, October 6, 2014, November 2014, January 26, 2015, February 23,

---

[48] Letter from Sean Jeffries to Jeff Peters re Millennium Tower (Feb. 28, 2016).

FIFTH AMENDED COMPLAINT

2015, and October 19, 2015, January 14, 2016 in various conference rooms in the Millennium Tower.  Sean Jeffries also did not have any reasonable ground for believing these representations were accurate when he made them because he knew that the Tower had already exceeded its revised predicted lifetime settlement, the settlement amount was not normal and was instead abnormal, and that the TJPA's construction activities would likely cause further differential settlement.

183.    In a further misrepresentation to the HOA, Sean Jeffries signed the Amended Easement Agreement with the TJPA, purporting to represent the HOA but without the authority to do so, which resulted in his, not the HOA's, receiving monitoring reports from the TJPA. At the time, Sean Jeffries did not have any reasonable ground for believing he was authorized to sign the Amended Easement Agreement with the TJPA on behalf of the HOA without the HOA's authority to do so.  After Sean Jeffries misrepresented that he was authorized to sign the Amended Easement Agreement with the TJPA on behalf of the HOA, Sean Jeffries or an employee and/or agent of one or more of the Millennium Defendants, and not the HOA, began receiving monitoring data collected by the TJPA, which further revealed that the Tower was settling vertically and differentially in excess of the design specifications, including the revised expected maximum settlement.  Sean Jeffries did not disclose this data to the HOA, but instead concealed it.

184.    Sean Jeffries intended that the HOA would rely on these representations by failing to take action to correct the defects and damage to the Millennium Tower of which it was not aware.

185.    The HOA reasonably relied on Sean Jeffries' representations because the HOA reasonably believed that Sean Jeffries would fulfill his duty of disclosure.

186.    In reliance on Sean Jeffries' representations, the HOA did not take corrective action to prevent continuing and future damage.

187.    The HOA's reliance on Sean Jeffries' representations was a substantial factor in causing damages to the HOA, including by diminishing the value of the common areas of Millennium Tower and by delaying any corrective action that could reduce the extent of

damage.

188.    Because Sean Jeffries withheld information from the HOA, Sean Jeffries necessarily possess full information concerning the facts of their own negligent acts.

189.    As a direct and proximate result of Sean Jeffries' negligent conduct, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

**B.    Secondary Liability**

190.    When making these negligent misrepresentations, Sean Jeffries was acting on behalf of MSD, for which he is an agent.  Sean Jeffries was acting as the agent of MSD and made the above misrepresentations in the scope of his authority as an agent of MSD.

191.    In the alternative, Sean Jeffries was acting on behalf of MSH, for which he is the Vice President.  Sean Jeffries was acting as the agent and/or employee of MSH and made these misrepresentations in the scope of his authority as an agent of MSH and/or within the scope of this employment as an employee of MSH.

192.    In the alternative, Sean Jeffries was acting on behalf of MPM, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPM and his conduct was in the scope of his authority as an agent of MPM and/or within the scope of this employment as an employee of MPM.

193.    In the alternative, Sean Jeffries was acting on behalf of MP LLC, for which he is an agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MP LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within the scope of this employment as an employee of MP LLC.

194.    In the alternative, Sean Jeffries was acting on behalf of MPI, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPI and his conduct was in the scope of his authority as an agent of MPI and/or within the scope of this employment as an employee of MPI.

195.    Alternatively, the Millennium Defendants are secondarily liable for this cause of action pursuant to the theories described in §IV *supra*.

196.    The Millennium Founders are secondarily liable for this cause of action

pursuant to the theories described in §IV *supra*.

197.    Sean Jeffries, the Millennium Defendants, the Millennium Founders, and Does 1 through 100, Inclusive are all jointly and severally liable for the HOA's damages caused by their negligent misrepresentation.

## SEVENTH CAUSE OF ACTION

**Fraudulent Misrepresentation Against Sean Jeffries (directly liable); Millennium Defendants (all indirectly liable based on agency, respondeat superior or secondary liability theories described in §IV); and Millennium Founders (all secondarily liable based on liability theories described in §IV), and Does 1 Through 100, Inclusive**

198.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 197 above as if fully set forth herein.

### A.    Direct Liability

199.    Sean Jeffries represented on February 28, 2014 to the HOA that he was not "aware to date of any information that gives us concern for the safety of the building or any significant impact on the structure."[49]  This representation was demonstrably false, which Sean Jeffries knew at the time he made it, as Sean Jeffries knew that the Tower had already exceeded the revised upper limit of the total expected lifetime settlement.

200.    At the time, Sean Jeffries knew that the Tower was originally predicted to sink no more than 4 to 6 inches over its lifetime, and that the predicted lifetime settlement of the Tower was later revised to 10.3 to 12.3 inches.  At the time of the representation on February 28, 2014, Sean Jeffries knew that the Tower had already exceeded its revised predicted lifetime settlement.  Sean Jeffries also knew that the TJPA's construction activities would likely cause further differential settlement.

201.    On information and belief, Sean Jeffries also made periodic presentations to the HOA at the executive session board meetings where he repeatedly assured the HOA that Millennium Partners was monitoring the building, was not aware of any concerns regarding building settlement, and that any settlement was within normal limits.  These

---

[49] Letter from Sean Jeffries to Jeff Peters re Millennium Tower (Feb. 28, 2016).

FIFTH AMENDED COMPLAINT

1   misrepresentations were made orally by Sean Jeffries to the members of the HOA's executive

2   committee at certain executive board meeting sessions between January 2014 and January

3   2016.  These meetings took place on or around January 2014, May 2014, October 6, 2014,

4   November 2014, January 26, 2015, February 23, 2015, and October 19, 2015, January 14,

5   2016 in various conference rooms in the Millennium Tower.  Sean Jeffries knew these

6   representations were not accurate when he made them because he knew that the Tower had

7   already exceeded its revised predicted lifetime settlement, the settlement amount was not

8   normal and was instead abnormal, and that the TJPA's construction activities would likely

9   cause further differential settlement.

10      202.    In a further misrepresentation to the HOA, Sean Jeffries signed the Amended

11  Easement Agreement with the TJPA, purporting to represent the HOA but without the

12  authority to do so, which resulted in his, not the HOA's, receiving monitoring reports from the

13  TJPA.  After Sean Jeffries misrepresented that he was authorized to sign the Amended

14  Easement Agreement with the TJPA on behalf of the HOA, Sean Jeffries or another employee

15  or agent of one of the Millennium Defendants, and not the HOA, began receiving monitoring

16  data collected by the TJPA, which further revealed that the Tower was settling vertically and

17  differentially in excess of the design specifications, including the revised expected maximum

18  settlement.  Sean Jeffries did not disclose this data to the HOA, but instead concealed it.

19      203.    Sean Jeffries intended that the HOA would rely on this representation by

20  failing to take action to correct the defects and damage to the Millennium Tower of which it

21  was not aware.

22      204.    The HOA reasonably relied on Sean Jeffries' representations because the HOA

23  reasonably believed that Sean Jeffries would fulfill his duty of disclosure.

24      205.    In reliance on Sean Jeffries' representations, the HOA did not take corrective

25  action to prevent continuing and future damage.

26      206.    The HOA's reliance on Sean Jeffries' representations caused damages to the

27  HOA, including by diminishing the value of the common areas of Millennium Tower and by

28  delaying any corrective action that could reduce the extent of damage.

207. Because Sean Jeffries intentionally withheld information from the HOA, Sean Jeffries necessarily possesses full information concerning the facts of his own fraudulent acts.

208. As a direct and proximate result of Sean Jeffries' fraudulent conduct, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

209. Because Sean Jeffries' conduct was malicious, oppressive, and fraudulent, and taken in knowing disregard of his legal duties, punitive damages should be awarded. Sean Jeffries knew that the construction and design of the Millennium Tower was deficient and that the Millennium Tower was suffering from vertical and differential settlement, and consciously and recklessly disregarded the probability of injury to residents of Millennium Tower units and to the common areas of the Millennium Tower by developing and marketing the Millennium Tower despite knowing that construction methods and design plans were deficient, and by continuing to market the units after receiving information that the building was sinking and tilting.

**B.     Secondary Liability**

210. When making these fraudulent misrepresentations, Sean Jeffries was acting on behalf of MSD, for which he is an agent. Sean Jeffries was acting as the agent of MSD and his conduct was in the scope of his authority as an agent of MSD.

211. In the alternative, Sean Jeffries was acting on behalf of MSH, for which he is the Vice President. Sean Jeffries was acting as the agent and/or employee of MSH and his conduct was in the scope of his authority as an agent of MSH and/or within the scope of this employment as an employee of MSH.

212. In the alternative, Sean Jeffries was acting on behalf of MPM, for which he is the agent and/or principal. Sean Jeffries was acting as the agent and/or employee of MPM and his conduct was in the scope of his authority as an agent of MPM and/or within the scope of this employment as an employee of MPM.

213. In the alternative, Sean Jeffries was acting on behalf of MP LLC, for which he is the agent and/or principal. Sean Jeffries was acting as the agent and/or employee of MP LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within

the scope of this employment as an employee of MP LLC.

214.    In the alternative, Sean Jeffries was acting on behalf of MPI, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPI and his conduct was in the scope of his authority as an agent of MPI and/or within the scope of this employment as an employee of MPI.

215.    Alternatively, the Millennium Defendants are secondarily liable for this cause of action pursuant to the theories described in §IV *supra*.

216.    The Millennium Founders are secondarily liable for this cause of action pursuant to the theories described in §IV *supra*.

217.    Sean Jeffries, the Millennium Defendants, the Millennium Founders, and Does 1 through 100, Inclusive are all jointly and severally liable for the HOA's damages caused by their fraudulent misrepresentation.

## EIGHTH CAUSE OF ACTION

**Fraudulent Concealment Against Sean Jeffries and Luciano (directly liable); Millennium Defendants (all secondarily liable based on agency, respondeat superior, or secondary liability theories described in §IV); and Millennium Founders (all secondarily liable based on theories described in §IV), and Does 1 Through 100, Inclusive**

218.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 217 above as if fully set forth herein.

**A.    Direct Liability**

219.    As designated contact for receipt of monitoring data from the TJPA, Sean Jeffries owed a fiduciary duty to the HOA, its board, and its members, who relied on Sean Jeffries to provide documentation and information regarding the condition of the Millennium Tower and to direct certain remediation measures.

220.    As a member of the HOA Board, Luciano owed a fiduciary duty to the HOA and its members.  In making certain partial disclosures to the HOA and its members, Luciano and Sean Jeffries also had a duty of full and accurate disclosure to the HOA and its members. Finally, as the persons and entities with exclusive knowledge of material information about

the condition of the Millennium Tower not available to the HOA, including the Tower's excessive vertical and differential settlement, Sean Jeffries, and Luciano owed a duty of disclosure to the HOA and its members.

221.    On information and belief, the HOA alleges that despite owing a duty of disclosure to the HOA, Sean Jeffries and Luciano intentionally failed to disclose certain facts regarding the excessive vertical and differential settlement of the Millennium Tower and instead actively concealed those facts for as long as possible.

222.    Sean Jeffries, and Luciano knew that the Tower was originally predicted to sink no more than 4 to 6 inches over its lifetime.  Sean Jeffries, and Luciano also knew that the predicted lifetime settlement of the Tower was later revised to 10.3 to 12.3 inches.

223.    On information and belief, Sean Jeffries and Luciano received monitoring data on the settlement building continuously over a period of years, starting as early as 2010.  Arup has prepared at least 58 memoranda to the TJPA providing updates on settlement monitoring through 2016.  On information and belief, this same settlement data was sent by TJPA to Sean Jeffries and Luciano, who in turn transmitted the settlement data to DeSimone for evaluation.  DeSimone then prepared its own analysis of the Arup data, summarized in numerous memoranda that were addressed to Steven Hood of Millennium Partners.[50]

224.    The DeSimone memoranda, based upon the Arup monitoring data and produced directly to Sean Jeffries and Luciano, unequivocally show excessive vertical and differential settlement of the Millennium Tower.  For example, a DeSimone Memorandum dated December 14, 2012, demonstrates the Tower had already sunk over 11 inches.

225.    Yet the HOA was not made aware of the true nature of the wrongful conduct and the full extent to which the Tower was experiencing excessive vertical and differential settlement until 2016.  Sean Jeffries, and Luciano failed to disclose to the HOA before 2016 that the Tower had exceeded the original predicted lifetime settlement range of 4 to 6 inches

---

[50] *See, e.g.*, Memorandum from Nicolas Rodrigues to Steven Hood (Millennium Partners) re: 301 Mission Street - Settlement Monitoring (review of most recent settlement data provided by Millennium Partners to DeSimone) (Dec. 13, 2013); Email from Brian Dykes (TJPA) to Steven Hood Re: Instrument Monitoring (attaching June 28, 2013 Arup Memorandum Re: Manually Read Inclinometer Update) (July 16, 2013).

as of January 2009, and Sean Jeffries and Luciano also failed to disclose to the HOA before 2016 that the Tower had already exceeded the revised predicted maximum lifetime settlement of 12.3 inches.

226.    As of the signing of the First Amendment to the Easement Amendment, Sean Jeffries, and Luciano also knew that the TJPA's construction activities at the site of the Transit Center would likely cause additional vertical and differential settlement of the Tower and the Podium, and potentially other damages.  As of early 2014, Sean Jeffries, and Luciano also knew that the TJPA's construction activities at the site of the Transit Center had already caused vertical and differential settlement of the Tower and the Podium, damage to the Garage, water intrusion, and other damages.

227.    On information and belief, the HOA alleges that Sean Jeffries and others, including representatives of the TJPA, signed a confidentiality agreement on March 17, 2010 to conceal from the HOA and others the extent of the settlement and that the TJPA's construction activities at the site of the Transit Center, adjacent to the Millennium Tower, would likely cause additional vertical and differential settlement of the Tower and the Podium.

228.    On information and belief, the HOA alleges that Sean Jeffries, in a further attempt to conceal from the HOA for as long as possible that the Tower was settling vertically and differentially in excess of the design specifications, signed the Amended Easement Agreement with the TJPA.  Because Sean Jeffries signed the Amended Easement Agreement with the TJPA, Sean Jeffries or other employees of the Millennium Defendants, and not the HOA, began receiving monitoring data collected by the TJPA, which further revealed that the Tower was settling vertically and differentially in excess of the design specifications, including the revised expected maximum settlement.  Sean Jeffries did not disclose this data to the HOA, but instead concealed it.

229.    Sean Jeffries knew that the Millennium Tower was settling differentially at least by March 15, 2010, if not earlier, when Sean Jeffries and others employees of Millennium Defendants received monitoring data from Arup that discussed differential

settlement.  Despite knowing of the differential settlement and the detrimental impact of the

TJPA's activities on the Millennium Tower, Sean Jeffries and Luciano failed to disclose to the

HOA the full extent of the wrongful conduct and its effects before 2016, including that the

TJPA's construction activities at the site of the Transit Center had contributed to the excessive

vertical and differential settlement of the Tower and the Podium far in excess of the design

specifications, damage to the Garage, water intrusion, and other damages.

230.    In his capacity as an executive for the Millennium Defendants, Luciano knew

of the vertical and differential settlement of the Tower and Podium and other ongoing

damages to the Property resulting from the design and construction defects and the TJPA's

activities.  Luciano, a Vice President at MPM and a member of the HOA's Board from

approximately 2009 through 2016, wrongfully failed to disclose to the HOA and its members

all material facts regarding the Tower and instead actively concealed them, in violation of his

duty of disclosure to the HOA.

231.    Sean Jeffries further represented on February 28, 2014 to the HOA that he was

not "aware to date of any information that gives us concern for the safety of the building or

any significant impact on the structure."  This representation was demonstrably false, which

Sean Jeffries knew at the time he made it, as Sean Jeffries knew that the Tower had already

exceeded the revised upper limit of the total expected lifetime settlement.  In a December 13,

2013 Memorandum to Millennium Partners, DeSimone observed that the total measured

settlement was "now officially outside the maximum predicted value provided by Treadwell

and Rollo (Langan)."

232.    In failing to disclose these material facts while instead making misleading

statements and only partially disclosing the true state of the Tower, Sean Jeffries and Luciano

intended to deceive the HOA, knowing that the HOA could not and would not take corrective

action to address problems of which the HOA was not aware.

233.    In reliance on Sean Jeffries and Luciano's misrepresentations and failures to

disclose, the HOA did not take early corrective action to prevent future damage.

234.    The HOA's reliance on the fraudulent concealment of Sean Jeffries, and

Luciano caused damages to the HOA, including by diminishing the value of the common areas of the Millennium Tower.

235.    Because Sean Jeffries and Luciano intentionally withheld information from the HOA, Sean Jeffries and Luciano necessarily possess full information concerning the facts of their own fraudulent acts.

236.    As a direct and proximate result of the fraudulent conduct of Sean Jeffries and Luciano, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

237.    Because the conduct of Sean Jeffries and Luciano was malicious, oppressive, and fraudulent, and taken in knowing disregard of their legal duties, punitive damages should be awarded.  Sean Jeffries and Luciano knew that the construction and design of the Millennium Tower was deficient and that the Millennium Tower was suffering from excessive vertical and differential settlement, and consciously and recklessly disregarded the probability of injury to residents of Millennium Tower units and to the common areas of the Millennium Tower by developing and marketing the Millennium Tower despite knowing that its construction methods and design plans were deficient, and by continuing to market the units after they received information that the building was sinking and tilting.

**B.      Secondary Liability**

238.    In engaging in these acts of fraudulent concealment, Sean Jeffries was acting on behalf of MSD, for which he is an agent.  Sean Jeffries was acting as the agent of MSD and made the above misrepresentations in the scope of his authority as an agent of MSD.

239.    In the alternative, Sean Jeffries was acting on behalf of MSH, for which he is the Vice President.  Sean Jeffries was acting as the agent and/or employee of MSH and made these misrepresentations in the scope of his authority as an agent of MSH and/or within the scope of this employment as an employee of MSH.

240.    In the alternative, Sean Jeffries was acting on behalf of MPM, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPM and his conduct was in the scope of his authority as an agent of MPM and/or within the scope

1  of this employment as an employee of MPM.

2        241.    In the alternative, Sean Jeffries was acting on behalf of MP LLC, for which he

3  is an agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MP

4  LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within

5  the scope of this employment as an employee of MP LLC.

6        242.    In the alternative, Sean Jeffries was acting on behalf of MPI, for which he is

7  the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPI and

8  his conduct was in the scope of his authority as an agent of MPI and/or within the scope of

9  this employment as an employee of MPI.

10        243.    In engaging in these acts of fraudulent concealment, Luciano was acting on

11  behalf of MSD, for which he is an agent and/or principal.  Luciano was acting as the agent

12  and/or employee of MSD and his conduct was in the scope of his authority as an agent of

13  MSD and/or within the scope of this employment as an employee of MSD.

14        244.    In the alternative, Luciano was acting on behalf of MSH, for which he is the

15  agent and/or principal.  Luciano was acting as the agent and/or employee of MSH and his

16  conduct was in the scope of his authority as an agent of MSH and/or within the scope of this

17  employment as an employee of MSH.

18        245.    In the alternative, Luciano was acting on behalf of MPM, for which he is the

19  Tower's Property Manager.  Luciano was acting as the agent and/or employee of MPM and

20  his conduct was in the scope of his authority as an agent of MPM and/or within the scope of

21  this employment as an employee of MPM.

22        246.    In the alternative, Luciano was acting on behalf of MP LLC, for which he is

23  the agent and/or principal.  Luciano was acting as the agent and/or employee of MP LLC and

24  his conduct was in the scope of his authority as an agent of MP LLC and/or within the scope

25  of this employment as an employee of MP LLC.

26        247.    In the alternative, Luciano was acting on behalf of MPI, for which he is the

27  agent and/or principal.  Luciano was acting as the agent and/or employee of MPI and his

28  conduct was in the scope of his authority as an agent of MPI and/or within the scope of this

1    employment as an employee of MPI.

2          248.    Alternatively, the Millennium Defendants are secondarily liable for this cause

3    of action pursuant to the theories described in §IV *supra*.

4          249.    The Millennium Founders are secondarily liable for this cause of action

5    pursuant to the theories described in §IV *supra*.

6          250.    Sean Jeffries, Luciano, the Millennium Defendants, the Millennium Founders,

7    and Does 1 Through 100, Inclusive are all jointly and severally liable for the HOA's damages

8    caused by defendants' fraudulent concealment.

9                          <u>**NINTH CAUSE OF ACTION**</u>

10   **Breach of Fiduciary Duty Against Sean Jeffries, Luciano, and MPI (directly liable);**

11   **Millennium Defendants (all indirectly liable based on agency and/or respondeat superior**

12   **and all secondarily liable based on theories described in §IV); and Millennium Founders**

13   **(all secondarily liable based on theories described in §IV), and Does 1 Through 100,**

14                                  **Inclusive**

15         251.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 250

16   above as if fully set forth herein.

17         **A.      Direct Liability**

18         252.    MPI owed a fiduciary duty to the HOA during the period when it was a

19   member of the HOA's Board of Directors, which occurred during the period from the creation

20   of the HOA Board in 2009 through at least part of 2011.  For example, at the March 30, 2010

21   HOA meeting, all five members present at the Board meeting were officers, directors, or

22   employees of MPI.  The following individuals employed by MPI were all on the HOA's

23   Board during the period from 2009 through at least part of 2011: Richard Baumert, Diana

24   Nelson, Maijken Johnson, Carrie Leung, John Luciano, Jeff Jeffries, and Craig Mooney.  In

25   addition, each of these board members represented publicly that they were employed by

26   "Millennium Partners," which referred to MPI.  Each was acting on behalf of MPI when

27   acting as board members of the HOA.

28         253.    MPI knew that the building was settling excessively and differentially by

1  March 15, 2010, if not earlier.  Yet MPI breached its fiduciary duties to the Board by, among

2  other acts and omissions, failing to maintain sufficient reserve and operating funds to

3  maintain and repair the known defects; failing to act in the best interests of the HOA by

4  immediately seeking to repair known defects and halt ongoing damage to the building; and by

5  acting in the best interests of MPI, not the HOA, through the concealment of information

6  about the excessive and differential settlement from homeowners and other Board members.

7  In so acting, MPI breached its fiduciary duties to the Board, including but not limited to its

8  duties of care, good faith and fair dealing, and loyalty.

9      254.    As designated contact for receipt of monitoring data from the TJPA, Sean

10  Jeffries owed a fiduciary duty to the HOA, its board, and its members.

11      255.    Despite owing this fiduciary duty, Sean Jeffries wrongfully failed to disclose to

12  the HOA and its members all material facts regarding the substantial defects at the

13  Millennium Tower.  Such failure constituted a breach of his fiduciary duties to the Board,

14  including but not limited to a breach of his duties of care, good faith and fair dealing, and

15  loyalty to the HOA.

16      256.    As a member of the HOA Board, Luciano owed a fiduciary duty to the HOA

17  and its members.  Board members are expected to act with good judgment, in good faith, and

18  in the best interests of their organization.

19      257.    Despite owing such a fiduciary duty, Luciano wrongfully failed to disclose to

20  the HOA and its members all material facts regarding the substantial defects at the

21  Millennium Tower.  Such failure constituted a breach of his fiduciary duties to the Board,

22  including but not limited to a breach of his duties of care, good faith and fair dealing, and

23  loyalty to the HOA.

24      258.    As a direct and proximate result of Sean Jeffries, Luciano and MPI's breaches,

25  the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

26      259.    The HOA also seeks punitive or exemplary damages because Sean Jeffries,

27  Luciano and MPI's conduct was malicious, oppressive, and fraudulent, and taken in knowing

28  disregard of their legal duties.  Sean Jeffries, Luciano, and MPI knew that the construction

and design of the Millennium Tower was deficient and that the Millennium Tower was suffering from excessive vertical and differential settlement, and consciously and recklessly disregarded the probability of injury to future residents of Millennium Tower units and to the common areas of the Millennium Tower by developing and marketing the Millennium Tower despite knowing that its construction methods and design plans were deficient, and by continuing to market the units after they received information that the building was sinking and tilting.

### B.    Secondary Liability

260.    In engaging in this breach of fiduciary duty, Sean Jeffries was acting on behalf of MSD, for which he is the agent.  Sean Jeffries was acting as the agent of MSD and his conduct was in the scope of his authority as an agent of MSD.

261.    In the alternative, Sean Jeffries was acting on behalf of MSH, for which he is the Vice President.  Sean Jeffries was acting as the agent and/or employee of MSH and his conduct was in the scope of his authority as an agent of MSH and/or within the scope of this employment as an employee of MSH.

262.    In the alternative, Sean Jeffries was acting on behalf of MPM, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPM and his conduct was in the scope of his authority as an agent of MPM and/or within the scope of this employment as an employee of MPM.

263.    In the alternative, Sean Jeffries was acting on behalf of MP LLC, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MP LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within the scope of this employment as an employee of MP LLC.

264.    In the alternative, Sean Jeffries was acting on behalf of MPI, for which he is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPI and his conduct was in the scope of his authority as an agent of MPI and/or within the scope of this employment as an employee of MPI.

265.    In engaging in this breach of fiduciary duty, Luciano was acting on behalf of

MSD, for which he is the agent.  Luciano was acting as the agent of MSD and his conduct was in the scope of his authority as an agent of MSD.

266.    In the alternative, Luciano was acting on behalf of MSH, for which he is the agent and/or principal.  Luciano was acting as the agent and/or employee of MSH and his conduct was in the scope of his authority as an agent of MSH and/or within the scope of this employment as an employee of MSH.

267.    In the alternative, Luciano was acting on behalf of MPM, for which he is the Tower's Property Manager.  Luciano was acting as the agent and/or employee of MPM and his conduct was in the scope of his authority as an agent of MPM and/or within the scope of this employment as an employee of MPM.

268.    In the alternative, Luciano was acting on behalf of MP LLC, for which he is the agent and/or principal.  Luciano was acting as the agent and/or employee of MP LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within the scope of this employment as an employee of MP LLC.

269.    In the alternative, Luciano was acting on behalf of MPI, for which he is the agent and/or principal.  Luciano was acting as the agent and/or employee of MPI and his conduct was in the scope of his authority as an agent of MPI and/or within the scope of this employment as an employee of MPI.

270.    In the alternative, the Millennium Defendants are indirectly liable based on secondary liability theories described in §IV *supra*.

271.    In addition, the Millennium Founders are indirectly liable based on secondary liability theories described in §IV *supra*.

272.    Sean Jeffries, Luciano, MPI, the Millennium Defendants, the Millennium Founders, and Does 1 through 100, Inclusive are all jointly and severally liable for the HOA's damages caused by defendants' breach of fiduciary duty.

### TENTH CAUSE OF ACTION

**Violation of Business and Professions Code § 17200 *et seq*. Against Sean Jeffries Luciano, and Millennium Defendants (all directly liable); Millennium Defendants (all**

**indirectly liable based on agency and/or respondeat superior and all secondarily liable based on theories described in §IV); and Millennium Founders (all indirectly liable based on all secondarily liable based on theories described in §IV), and Does 1 Through 100, Inclusive**

273.   The HOA re-alleges and incorporates by reference Paragraphs 1 through 272 above as if fully set forth herein.

**A.     Direct Liability**

274.   California Business and Professions Code section 17200 *et seq.* prohibit unfair competition, including any unlawful, unfair, or fraudulent business act or practice.

275.   The conduct of the Millennium Defendants, Sean Jeffries, and Luciano alleged herein constitutes unlawful, unfair, or fraudulent business acts or practices.

276.   The Millennium Defendants, Sean Jeffries, and Luciano's unlawful, unfair, and fraudulent business acts and practices included a pattern of violations of California Civil Code section 1134(b) in that they repeatedly failed to disclose the nature and extent of the vertical and differential settlement of the Millennium Tower to the HOA or its members.

277.   Sean Jeffries' unlawful, unfair, or fraudulent business acts or practices include his misrepresentations in the course of his dealings and communications with the HOA Board, and his failure to disclose the differential settlement of the Millennium Tower to the HOA or its members.

278.   Luciano's unlawful, unfair, or fraudulent business acts or practices include his misrepresentations in the course of his dealings and communications with the HOA Board, and his failure to disclose the differential settlement of the Millennium Tower to the HOA or its members.

279.   MPI's unlawful, unfair, or fraudulent business acts or practices include its failure to disclose the differential settlement of the Millennium Tower to the HOA or its members in breach of its fiduciary duty.

280.   As a direct and proximate result of the conduct of the Millennium Defendants, Sean Jeffries and Luciano constituting unfair, unlawful, or fraudulent business practices, the

1  HOA has suffered and will continue to suffer damages entitling it to restitution in an amount

2  to be proved at trial.

3      281.    The HOA also seeks an order that Sean Jeffries, John Luciano, and the

4  Millennium Defendants, be required to provide restitution to the HOA to restore money or

5  property acquired by means of the Millennium Defendants, Sean Jeffries and Luciano's

6  unfair, unlawful, or fraudulent practices and that resulted in injury to the common areas of the

7  Millennium Tower.

8      **B.    Secondary Liability**

9      282.    Sean Jeffries was acting on behalf of MSD, for which he is the agent.  Sean

10  Jeffries was acting as the agent of MSD and his conduct was in the scope of his authority as

11  an agent of MSD.

12      283.    In the alternative, Sean Jeffries was acting on behalf of MSH, for which he is

13  the Vice President.  Sean Jeffries was acting as the agent and/or employee of MSH and his

14  conduct was in the scope of his authority as an agent of MSH and/or within the scope of this

15  employment as an employee of MSH.

16      284.    In the alternative, Sean Jeffries was acting on behalf of MPM, for which he is

17  the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPM

18  and his conduct was in the scope of his authority as an agent of MPM and/or within the scope

19  of this employment as an employee of MPM.

20      285.    In the alternative, Sean Jeffries was acting on behalf of MP LLC, for which he

21  is the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MP

22  LLC and his conduct was in the scope of his authority as an agent of MP LLC and/or within

23  the scope of this employment as an employee of MP LLC.

24      286.    In the alternative, Sean Jeffries was acting on behalf of MPI, for which he is

25  the agent and/or principal.  Sean Jeffries was acting as the agent and/or employee of MPI and

26  his conduct was in the scope of his authority as an agent of MPI and/or within the scope of

27  this employment as an employee of MPI.

28      287.    Luciano was acting on behalf of MSD, for which he is the agent.  Luciano was

1  acting as the agent of MSD and his conduct was in the scope of his authority as an agent of

2  MSD.

3       288.  In the alternative, Luciano was acting on behalf of MSH, for which he is the

4  agent and/or principal.  Luciano was acting as the agent and/or employee of MSH and his

5  conduct was in the scope of his authority as an agent of MSH and/or within the scope of this

6  employment as an employee of MSH.

7       289.  In the alternative, Luciano was acting on behalf of MPM, for which he is the

8  Tower's Property Manager.  Luciano was acting as the agent and/or employee of MPM and

9  his conduct was in the scope of his authority as an agent of MPM and/or within the scope of

10  this employment as an employee of MPM.

11       290.  In the alternative, Luciano was acting on behalf of MP LLC, for which he is

12  the agent and/or principal.  Luciano was acting as the agent and/or employee of MP LLC and

13  his conduct was in the scope of his authority as an agent of MP LLC and/or within the scope

14  of this employment as an employee of MP LLC.

15       291.  In the alternative, Luciano was acting on behalf of MPI, for which he is the

16  agent and/or principal.  Luciano was acting as the agent and/or employee of MPI and his

17  conduct was in the scope of his authority as an agent of MPI and/or within the scope of this

18  employment as an employee of MPI.

19       292.  In the alternative, the Millennium Defendants indirectly liable based on

20  secondary liability theories described in §IV *supra*.

21       293.  In addition, the Millennium Founders indirectly liable based on secondary

22  liability theories described in §IV *supra*.

23       294.  Sean Jeffries, Luciano, the Millennium Defendants, the Millennium Founders,

24  and Does 1 Through 100, Inclusive are all jointly and severally liable for the HOA's damages

25  caused by defendants' violations of Business & Professions Code section 17200 *et seq*.

26  **ELEVENTH CAUSE OF ACTION**

27  **Inverse Condemnation Against the TJPA**

28       295.  The HOA re-alleges and incorporates by reference Paragraphs 1 through 294

79

1    above as if fully set forth herein.

2          296.    Inverse condemnation claims arise under Article I, section 19, of the California

3    Constitution, which provides that "[p]rivate property may be taken or damaged for a public

4    use and only when just compensation … has first been paid to … the owner." Cal. Const. art.

5    I, § 19.

6          297.    The construction of the Transit Center and Support System substantially

7    affected the support, safety, and integrity of the Millennium Tower.  The soil beneath the

8    Millennium Tower has been destabilized by the construction of the Transit Center and

9    Support System, and the Property has suffered from material movement and/or settlement,

10   which is expected to continue for the foreseeable future.  This movement and settlement is

11   both vertical and differential and has resulted, and will continue to result, in cracks in the

12   foundations, slabs, and walls of the Millennium Tower, water intrusion through foundation

13   walls, displacement of sewer and other utility connections, and other damage.

14         298.    The TJPA's construction activities at the site of the Transit Center, adjacent to

15   the Millennium Tower, have caused vertical and differential settlement of the Tower and

16   Podium, damage to the Garage, water intrusion, and other damages.

17         299.    Construction of the Transit Center is ongoing such that harm to the Millennium

18   Tower is continuous and ongoing.  Accordingly, the full extent of any actual or potential harm

19   to the Millennium Tower is unknown and ongoing.

20         300.    The TJPA's construction of the Transit Center is a substantial and proximate

21   cause of the vertical and differential settlement of the Tower and Podium, damage to the

22   Garage, water intrusion, and other damages.

23         301.    The HOA has suffered a taking of its property by the TJPA entitling the HOA

24   to just compensation under Article I, section 19, of the California Constitution and the Fifth

25   and Fourteenth Amendments to the United States Constitution.

26         302.    The HOA is also entitled to costs, disbursements, and expenses, including

27   attorney, appraisal, and engineering fees pursuant to Code of Civil Procedure Section 1036.

28

## **TWELFTH CAUSE OF ACTION**

### **Trespass Against the TJPA and the Salesforce Tower Defendants**

303.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 302 above as if fully set forth herein.

304.    By its construction of the shoring wall, buttress wall, and related construction activities, the TJPA has intentionally, recklessly, or negligently entered the Millennium Tower or negligently caused construction-related objects to enter the Millennium Tower.

305.    This entry into the Millennium Tower exceeded the TJPA's permission to enter the Property.

306.    The TJPA's conduct damaged the HOA because it was a substantial factor in causing vertical and differential settlement of the Millennium Tower, as well as cracks in the foundations, slabs, and walls of the Tower, Podium and Garage, water intrusion through foundation walls, displacement of sewer and other plumbing pipes, and other damage.

307.    Construction of the Transit Center is ongoing such that harm to the Millennium Tower is continuous and ongoing.  Accordingly, the full extent of any actual or potential harm to the Millennium Tower is unknown and ongoing.

308.    By its construction of the Salesforce Tower, including the dewatering, excavation, and installation of tiebacks and monitoring equipment, including activities on the Property itself, the Salesforce Tower Defendants have intentionally, recklessly, or negligently entered the Millennium Tower or negligently caused construction-related objects to enter the Millennium Tower and the Property.  Specifically, through their construction activities, the Salesforce Tower Defendants set in motion a force that "extende[d] its energy to the plaintiff's premises to its material injury."  *Elton v. Anheuser-Busch Bev. Group, Inc.*, 50 Cal. App. 4th Dist. 1301, 1306 (1996).

309.    The HOA did not give the Salesforce Tower Defendants permission to enter the Property.

310.    The Salesforce Tower Defendants' conduct damaged the HOA because it was a substantial factor in causing vertical and differential settlement of the Millennium Tower, as

well as cracks in the foundations, slabs, and walls of the Tower, Podium and Garage, water intrusion through foundation walls, displacement of sewer and other plumbing pipes, and other damage.

311.   Construction of the Salesforce Tower is ongoing such that harm to the Millennium Tower is continuous and ongoing.  Accordingly, the full extent of any actual or potential harm to the Millennium Tower is unknown and ongoing.

312.   As a direct and proximate result of the TJPA and the Salesforce Tower Defendants' wrongful conduct, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

## THIRTEENTH CAUSE OF ACTION

### Nuisance Against the TJPA and the Salesforce Tower Defendants

313.   The HOA re-alleges and incorporates by reference Paragraphs 1 through 312 above as if fully set forth herein.

314.   The TJPA's construction of the Transit Center and the Salesforce Tower Defendants' construction of the Salesforce Tower has caused or contributed to the sinking and tilting of the Millennium Tower, and the other damages alleged herein.

315.   The TJPA's and the Salesforce Tower Defendants' use and maintenance of their properties has interfered with and continues to interfere with the HOA's and the HOA's members' use and enjoyment of the Millennium Tower common areas and has damaged and continues to damage the Millennium Tower.  The excessive vertical and differential settlement is continuing and keeps adversely impacting the Millennium Tower, as alleged above.

316.   The TJPA's activities in constructing the Transit Center and the Salesforce Tower Defendants' construction of the Salesforce Tower have substantially contributed to the Millennium Tower's excessive and differential settlement, as well as cracks in the foundations, slabs, and walls of the Tower, Podium and Garage, water intrusion through foundation walls, displacement of sewer and other plumbing pipes, and other damage and thereby have resulted in a diminution in the Millennium Tower's value.

317.    Construction of the Transit Center and the Salesforce Tower is ongoing such that harm to the Millennium Tower is continuous and ongoing.  Accordingly, the full extent of any actual or potential harm to the Millennium Tower is unknown and ongoing.

318.    The substantial invasion of the HOA's interest in the use and enjoyment of the common areas is unreasonable.

319.    As a result of the TJPA and the Salesforce Tower Defendants' construction activities, the HOA has suffered damages as set forth herein.

320.    As a direct and proximate result of the TJPA and the Salesforce Tower Defendants' wrongful conduct, the HOA has suffered and will continue to suffer damages in an amount to be proved at trial.

321.    The TJPA and the Salesforce Tower Defendants are jointly and severally liable for the HOA's damages resulting from defendants' nuisance.

**FOURTEENTH CAUSE OF ACTION**

**Violation of Statutory Duty to Provide Subjacent and Lateral Support**

**Pursuant to California Civil Code § 832 Against the TJPA, the Salesforce Tower**

**Defendants, and Does 1 Through 100, Inclusive**

322.    The HOA re-alleges and incorporates by reference Paragraphs 1 through 321 above as if fully set forth herein.

323.    The Millennium Tower receives lateral and subjacent support from the soil underlying the Transit Center, which adjoins the Millennium Tower to the southeast, and the soil underlying the Salesforce Tower and Fremont Street, which adjoins the Millennium Tower to the southwest.

324.    The TJPA directed excavation and dewatering work at the Transit Center, by and through their agents and/or employees.

325.    The TJPA's excavation and dewatering work, and the manner in which this work was undertaken, was deliberately designed and constructed for the purpose of constructing improvements at the Transit Center.

FIFTH AMENDED COMPLAINT

326.    The Salesforce Tower Defendants directed excavation, drilling, and dewatering work, and have exerted lateral forces on the soil under and adjacent to the Millennium Tower, by and through their agents and/or employees.

327.    The Salesforce Tower Defendants' excavation, drilling, and dewatering work, together with their work resulting in the exertion of lateral forces on the soil underneath the Tower, and the manner in which this work was undertaken, was deliberately completed for the purpose of constructing improvements at the Salesforce Tower.

328.    The excavations at the Transit Center and Salesforce Tower are deeper than the standard depth of foundations as defined by statute.

329.    On information and belief, the HOA alleges that both the TJPA and the Salesforce Tower Defendants failed to exercise ordinary care and skill and take reasonable precautions to sustain the adjoining land, and the land underneath the Property as required by California Civil Code Section 832.

330.    As a direct and proximate cause of the TJPA's excavation and dewatering at the Transit Center, the Millennium Tower was deprived of lateral and subjacent support.  The TJPA's construction, excavation, and dewatering resulted in harm to the Millennium Tower, and to the Millennium Tower experiencing differential and vertical settlement beyond even the revised maximum settlement prediction provided by Treadwell & Rollo in 2009 of 10.3-12.3 inches,[51] as well as in cracks in the foundations, slabs, and walls of the Tower, Garage and Podium, water intrusion through foundation walls, displacement of sewer and other plumbing pipes, and other damage.

331.    Additionally, as a direct and proximate cause of the Salesforce Tower Defendants' excavation, drilling, dewatering, and exertion of lateral forces on the soil under the Tower and the Property, the Millennium Tower was further deprived of lateral and subjacent support.  The Salesforce Tower Defendants' construction, excavation, dewatering, and exertion of lateral forces resulted in harm to the Millennium Tower, and to the Millennium Tower experiencing further differential and vertical settlement beyond even the

---

[51] Letter from Treadwell & Rollo to DBI (Feb. 19, 2009).

1  revised maximum settlement prediction provided by Treadwell & Rollo in 2009 of 10.3-12.3

2  inches, as well as in cracks in the foundations, slabs, and walls of the Tower, Garage and

3  Podium, water intrusion through foundation walls, displacement of sewer and other plumbing

4  pipes, and other damage.

5  332.   Construction of the Transit Center and Salesforce Tower is ongoing such that

6  harm to the Millennium Tower is continuous and ongoing.  Accordingly, the full extent of any

7  actual or potential harm to the Millennium Tower is unknown and ongoing.

8  333.   As a direct and proximate result of the TJPA's and the Salesforce Tower

9  Defendants' breach of duty pursuant to Section 832, the HOA has suffered and will continue

10  to suffer damages in an amount to be proved at trial.

11  334.   The TJPA and the Salesforce Tower Defendants are jointly and severally liable

12  for the HOA's damages resulting from defendants' denial of subjacent and lateral support to

13  the Millennium Tower.

## FIFTEENTH CAUSE OF ACTION

### Petition for Writ of Mandate to Compel Enforcement of CEQA Mitigation Measures Against TJPA

17  335.   The HOA re-alleges and incorporates by reference Paragraphs 1 through 334

18  above as if fully set forth herein.

19  336.   The FEIR and Mitigation Monitoring and Reporting Program set forth the

20  enforceable mitigation measures that TJPA adopted under CEQA to avoid significant impacts

21  on the environment, and the basic framework through which the enforceable mitigation

22  measures will be monitored to ensure implementation.  These mitigation measures included

23  the obligation to monitor adjacent buildings for movement and take immediate action to

24  control the movement if any is detected.

25  337.   TJPA is responsible for both the implementation and monitoring of Mitigation

26  Measures SG-1 through SG-5, as set forth in the Mitigation Monitoring and Reporting

27  Program.

28  338.   Despite TJPA's mandatory duty to implement, monitor, and enforce mitigation

1  pursuant to the Mitigation Monitoring and Reporting Program, TJPA has failed to take

2  required procedures or corrective measures to prevent the effects of the construction of the

3  Transit Center, and that failure has led to an increased rate and increased amount of settlement

4  of the Tower.

5        339.    Construction of the Transit Center is ongoing.  As such, any harm to the Tower

6  from the Transit Center is continuous and repeated, and will remain so until impacts to the

7  Tower resulting from Transit Center-related construction have stabilized.  Until then, the full

8  extent of any actual or potential harm to the Tower resulting from vertical or differential

9  settlement is unknown and ongoing.

10       340.    TJPA's failures as alleged herein breached mandatory duties and were not

11  discretionary acts.

12       341.    TJPA's duty to take corrective action is mandatory and subject to a writ of

13  mandate notwithstanding any discretionary component in the manner in which the agency

14  performs its mandatory duty.  *See Coachella Valley Unified Sch. Dist. v. State of Cal.*, 176

15  Cal. App. 4th 93, 113 (2009) ("And, while a party may not invoke the remedy to force a

16  public entity to exercise discretionary powers in any particular manner, if the entity refuses to

17  act, mandate is available to compel the exercise of those discretionary powers in some way.");

18  *L. A. Cty. Emps. Ass'n, Local 660 v. Cty. of L.A.*, 33 Cal. App. 3d 1, 8 (1973) ("While

19  mandamus will not lie to compel governmental officials to exercise their discretionary powers

20  in a particular manner, it will lie to compel them to exercise them in some manner.").

21  Mandate is appropriate to compel TJPA to exercise discretion and take corrective action as

22  required by law.

23       342.    The HOA has a direct and beneficial interest in ensuring that TJPA performs

24  the Mitigation Measures, which were intended to protect the Tower, and has exhausted all

25  other available remedies.

26       343.    The HOA has a beneficial right to TJPA's performance of its duties based on

27  the HOA's interest in mitigating further harmful effects to the Tower from subsidence and

28  issues related to the removal of lateral and subjacent support due to neighboring construction

1    and dewatering activities.

2         344.    The HOA seeks only equitable, non-monetary relief as to this cause of action.

3    The HOA has no plain, speedy, and adequate remedy at law, in that unless this Court issues a

4    writ mandating TJPA to undertake the obligations and responsibilities it is charged with under

5    relevant local and state law, there is no assurance TJPA will perform its mandatory duties.

6         345.    A dispute has arisen between the HOA and TJPA in that the HOA believes and

7    contends, for the reasons set forth above, that TJPA's actions as set forth above were unlawful

8    and invalid.  The HOA is informed and believes, and on that basis contends, that TJPA

9    contends in all respects to the contrary.

10                        **IX.    PRAYER FOR RELIEF**

11        **WHEREFORE, Plaintiff prays for relief as follows:**

12        1.      For compensatory and special damages, according to proof at trial but believed to

13   exceed Two Hundred Million Dollars ($200,000,000);

14        2.      For interest thereon at the maximum legal rate;

15        3.      For statutory damages as set forth in California Civil Code section 895 *et seq.*;

16        4.      For expert fees and investigative costs regarding the nature and extent of the

17   violations of standards, defective conditions, resulting damages, and appropriate method of

18   repairing these damages and defective conditions in accordance with *Stearman v. Centex Homes*,

19   78 Cal. App. 4th 611 (2000), according to proof at trial;

20        5.      For an order that the Millennium Defendants be required to disgorge the profits

21   they have wrongfully obtained and provide the HOA restitution;

22        6.      For injunctive relief to prevent the defendants' conduct that is continuing to cause

23   damage to the HOA and to the Tower and is a nuisance, and to remedy and repair the Tower's

24   defects;

25        7.      For cost of relocation, loss of use, substitute housing, and mitigation expenses;

26        8.      For punitive and/or statutory exemplary damages;

27        9.      For costs of suit and reasonable attorneys' fees incurred herein; and

28        10.     For an award holding all defendants jointly and severally liable for all of the

HOA's damages, costs, fees, and interests arising from the defendants' joint tortious conduct.

11.    For a writ of mandate commanding TJPA to carry out its obligations to implement the monitoring and mitigation measures set forth in the Mitigation Monitoring and Reporting Program, including specifically Mitigation Measures SG 1, 4 and 5, under which TJPA is obligated to monitor adjacent buildings for movement, and if movement is detected, take immediate action to control the movement.

12.    For any and all other relief the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all triable issues.

Dated: April 10, 2018

DANIEL M. PETROCELLI
VISION WINTER
O'MELVENY & MYERS LLP

By:_____
      Daniel M. Petrocelli
      Attorneys for Plaintiff

## PROOF OF SERVICE

I am over the age of eighteen years and not a party to the within action.  I am a resident of or employed in the county where the service described below occurred.  My business address is 2765 Sand Hill Road, Menlo Park, California  94025-7019.

On April 16, 2018, I served true and correct copies of the following document(s):

**FIFTH AMENDED COMPLAINT FOR:**
**1) VIOLATION OF CAL. CIV. CODE § 895 *ET SEQ.*; 2) NEGLIGENCE; 3)**
**BREACH OF EXPRESS WARRANTIES; 4) BREACH OF IMPLIED**
**WARRANTIES; 5) STRICT LIABILITY; 6) NEGLIGENT**
**MISREPRESENTATION; 7) FRAUDULENT MISREPRESENTATION; 8)**
**FRAUDULENT CONCEALMENT; 9) BREACH OF FIDUCIARY DUTY; 10)**
**VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*;**
**11) INVERSE CONDEMNATION; 12) TRESPASS; 13) NUISANCE; 14)**
**VIOLATION OF CAL. CIV. CODE § 832; AND 15) VERIFIED PETITION FOR**
**WRIT OF MANDATE**

on the following persons at the locations and/or electronic transmission address as follows:

***Please see Service List below.***

in the manner indicated below:

☐  **BY UNITED STATES MAIL**:  Following ordinary business practices, I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and mailing with the United States Postal Service.  I am readily familiar with the practices of the O'Melveny & Myers LLP's office for collecting and processing mail.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be deposited, postage prepaid, with the United States Postal Service that same day.

☐  **BY PERSONAL SERVICE**:  I sealed true and correct copies of the above documents in addressed envelope(s) and caused such envelope(s) to be delivered by hand at the above locations by a professional messenger service.  **A declaration from the messenger who made the delivery ☐ is attached or ☐ will be filed separately with the court.**

☐  **BY OVERNIGHT DELIVERY**:  I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and delivery by overnight courier service.  I am readily familiar with the practices of the O'Melveny & Myers LLP's office for sending overnight deliveries. In the ordinary course of business, the sealed envelope (&) that I placed for collection would be collected by a courier the same day.

1

1   ☐   **BY ELECTRONIC MAIL:** I caused the documents to be sent to the person(s) at the
2         electronic service address (es) listed below. Such document(s) were transmitted *via*
          electronic mail from the electronic address: jsantillana@omm.com ☒ in portable
3         document format ("PDF") Adobe Acrobat or ☐ in Word document format.  OR

4   ☒   **BY ELECTRONIC FILING:** I electronically served the above referenced
          document(s) through File & ServeXpress. E-Service in this action was completed on all
5         parties listed on the service list with File & ServeXpress. This service complies with
          the Court's Local Rule 2.10 for allowance of documents to be voluntarily filed and
6         served upon interested parties via File & ServeXpress E-Service System.

7             I declare under penalty of perjury under the laws of the State of California that the

8   above is true and correct. Executed on April 16, 2018, at Menlo Park, California.

9

10

11                                                   _____

12                                                           Diana Diaz

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

PROOF OF SERVICE

## SERVICE LIST

| | |
|---|---|
| Peter C. Meier<br>Sean D. Unger<br>William Sullivan<br>Grace Carter<br>Stephanie Kuhlman<br>Paul Hastings LLP<br>101 California St., 48th Fl.<br>San Francisco, CA  94111<br><br>Email:    petermeier@paulhastings.com<br>        seanunger@paulhastings.com<br>        williamsullivan@paulhastings.com<br>        gracecarter@paulhastings.com<br>        stephaniekuhlman@paulhastings.com<br><br>Telephone    (415) 856-7000<br>Facsimile:    (415) 856-7100<br><br>Scott D. Carlton<br>Paul Hastings LLP<br>515 South flower Street, 25th Fl.<br>Los Angeles, CA  90071<br><br>Email:    scottcarlton@paulhastings.com<br><br>Telephone:    (213) 683-6113<br>        (213) 683-6113<br><br><br>Charles A. Patrizia<br>Paul Hastings LLP<br>875 15th Street, N.W.<br>Washington, DC  20005<br><br>Email    charlespatrizia@paulhastings.com<br><br>Telephone:    (202) 551-1710<br>Facsimile:    (202) 551-1705 | Attorneys for Mission Street Development LLC; Mission Street Holdings LLC; Millennium Partners Management LLC; Millennium Partners LLC; Christopher M. Jeffries; Philip E. Aarons; Philip H. Lovett; Sean Jeffries, John Luciano, and Richard Baumert |
| Clement L. Glynn<br>Andrew T. Mortl<br>Adam M. Rapp<br>GLYNN & FINLEY LLP<br>One Walnut Creek Center<br>100 Pringle Ave., Ste 500<br>Walnut Creek, CA  94596<br><br>Email:    cglynn@glynnfinley.com<br>        amortl@glynnfinley.com<br>        arapp@glynnfinley.com<br><br>Telephone:    (925) 210-2800<br>Facsimile:    (925) 945-1975 | Attorneys for Phillip E. Aarons and Phillip H. Lovett |

PROOF OF SERVICE

| | |
|---|---|
| William J. Peters<br>Matthew T. Hawk<br>Amy Alexander<br>Gordon & Rees LLP<br>275 Battery St., Ste. 2000<br>San Francisco, CA 94111<br><br>Email:    wpeters@grsm.com<br>          mhawk@grsm.com<br>          aalexander@grsm.com<br><br>Telephone:  (415) 875-3143<br>Facsimile:   (415) 986-8054 | Attorneys for Webcor Construction LP, dba Webcor Builders, survivor to a merger with Webcor Construction, Inc. |
| Michael K. De Chiara<br>Louis J. Dennis<br>Matthew C. Dials<br>Zetlin & DeChiara LLP<br>801 Second Ave.<br>New York, NY  10017<br><br>Email:    mkd@zdlaw.com<br>          ldennis@zdlaw.com<br>          mdials@zdlaw.com<br><br>Telephone:  (212) 682-6800<br>Facsimile:   (212) 682-6861 | Attorneys for Handel Architects, LLP and DeSimone Consulting Engineers LLC, a.k.a DeSimone Consulting Engineers, PLLC |
| Robert J. Buccieri<br>Daniel Edington<br>Furukawa Buccieri LLP<br>800 Airport Blvd., Ste. 504<br>Burlingame, CA  94010-1930<br><br>Email:    rob@fubulaw.com<br>          daniel@fubulaw.com<br><br>Telephone:  (415) 510-2222<br>Facsimile:   (415) 510-2240 | Attorneys for Handel Architects, LLP and DeSimone Consulting Engineers LLC, a.k.a DeSimone Consulting Engineers, PLLC |
| Andrew G. Giacomini<br>Miles C. Holden<br>Kaylen Kadotni<br>Cole Benbow<br>Kate Bendick<br>Hanson Bridgett LLP<br>425 Market St., 26th Fl.<br>San Francisco, CA  94105<br><br>Email:    agiacomini@hansonbridgett.com<br>          mholden@hansonbridgett.com<br>          kkadotani@hansonbridgett.com<br>          cbenbow@hansonbridgett.com<br>          kbendick@hansonbridgett.com<br>Telephone:  (415) 777-3200<br>Facsimile:   (415) 541-9366 | Attorneys for Treadwell & Rollo, Inc., subsequently known by name change as "T&R Consolidated, Inc.," a dissolved corporation |

4

PROOF OF SERVICE

| | |
|---|---|
| John B. Quinn<br>Steven G. Madison<br>Jacob H. Polin<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>50 California St., 22nd Fl<br>San Francisco, CA  9411<br><br>Email:      johnquinn@quinnemanuel.com<br>                stevemadison@quinnemanuel.com<br>                jacobpolin@quinnemanuel.com<br><br>Telephone:    (415) 875-6600<br>Facsimile:     (415) 875-6700<br><br>David A. Ericksen<br>Johanna M. Berta<br>Severson & Werson, APC<br>One Embarcadero Center, Suite 2600<br>San Francisco, CA  94111<br><br>Email:      dae@severson.com<br>                jmb@severson.com<br>Telephone:    (415) 398-3344<br>Facsimile:     (415) 956-0439 | Attorneys for Langan Engineering and Environmental Services, Inc. |
| Daniel D. McMillan<br>Jacqueline S. DeCamara<br>Jones Day<br>555 California St., 26th Fl.<br>San Francisco, CA  94104<br><br>Email:      ddmcmillan@jonesday.com<br>                jdecamara@jonesday.com<br><br>Telephone:    (213) 489 3939<br>Facsimile:     (213) 243-2539<br><br><br>Thomas M. Donnelly<br>Jones Day<br>555 California St., 26th Fl.<br>San Francisco, CA  94104<br><br>Email:      tmdonnelly@jonesday.com<br><br>Telephone:    (415) 626-3939<br>Facsimile:     (415) 875-5700<br><br>Jeffrey B. Kirzner<br>Jones Day<br>3161 Michelson Dr., Ste. 800<br>Irvine, CA  92612-4408<br><br>Email:      jkirzner@jonesday.com<br>Telephone:    (949) 553-7533<br>Facsimile:     949) 553-7539 | Attorneys for Transbay Joint Powers Authority; Alameda-Contra Costa Transit District and Peninsula Corridor Joint Powers Board |

| | |
|---|---|
| Andrew W. Schwartz<br>Edward T. Schexnayder<br>Anna P. Gunderson<br>Shute, Mihaly & Weinberger LLP<br>396 Hayes Street<br>San Francisco, CA  94102<br><br>Email:          Schwartz@smwlaw.com<br>                     Schexnayder@smwlaw.com<br>                     Gunderson@smwlaw.com<br><br>Telephone:   (415) 552-7272<br>Facsimile:    (415) 552-5816 | |
| Barclay Richard Nicholson<br>Andrew Elkhoury<br>Norton Rose Fulbright US LLP<br>1301 McKinney, Ste 5100<br>Houston, TX  77010-3095<br><br>Email:          barclay.nicholson@nortonrosefulbright.com<br>                     andrew.elkhoury@nortonrosefulbright.com<br><br>Telephone:   (713) 651-5151<br>Facsimile:    (713) 651-5246<br><br>Joshua D. Lichtman<br>Kelsey A. Maher<br>Norton Rose Fulbright US LLP<br>555 South Flower Street, Forty-First Fl.<br>Los Angeles, CA  90071<br><br>Email:          joshua.lichtman@nortonrosefulbright.com<br>                     Kelsey.maher@nortonrosefulbright.com<br><br>Telephone:   (213) 892-9200<br>Facsimile:    (213) 892-9494 | Attorneys for Transbay Joint Powers Authority |
| Christine E. Drage<br>Jihan Murad<br>S. Bradley Hart<br>Jacqueline C. Pons-Bunney<br>Weil & Drage APC<br>23212 Mill Creek Dr.<br>Laguna Hills, CA  92653<br><br>Email:          cdrage@weildrage.com<br>                     jmurad@weildrage.com<br>                     bhart@weildrage.com<br><br>Telephone:   (949) 837-8200 (ext. 310)<br>Facsimile:    (949) 837-9300 | Attorneys for Arup North America Ltd. |

PROOF OF SERVICE

1 │ David Hatem
  │ Donovan Hatem LLP
2 │ Exchange Place
  │ 53 State St.
3 │ Boston, MA  02109

4 │ Email:          dhatem@donovanhatem.com
  │ Telephone:    (617) 406-4800
5 │ Facsimile:    (617) 406-4501

6 │ David B. Casselman                              Attorneys for Plaintiffs
  │ David Polinsky
7 │ Kirk S. Comer                                   Lehman v Transbay Joint Powers
  │ Casselman Law Group                             Authority, et al;
8 │ 5567 Reseda Blvd., Ste. 330                     Case No. CGC-16-553758
  │ Tarzana, CA  91356
9 │
  │ Email:          dbc@casselmanlawgroup.com
10│                 dp@casselmanlawgroup.com
  │                 ksc@casselmanlawgroup.com
11│
  │ Telephone:    (818) 609-2300
12│ Facsimile:    (818) 345-0162

13│ William B. Smith
  │ Robert J. Waldsmith
14│ Abramson Smith Waldsmith LLP
  │ 44 Montgomery St.
15│ San Francisco, CA  94104

16│ Email:          wbs@aswllp.com
  │                 rjw@aswllp.com
17│
18│ Telephone:    (415) 421-7995
  │ Facsimile:    (415) 421-0912
19│
  │ Michael A. Geibelson
20│ Jill S. Casselman
  │ ROBINS KAPLAN LLP
21│ 2049 Century Park East, Ste. 3400
  │ Los Angeles, CA  90067-3208
22│
23│ Email:          mgeibelson@robinskaplan.com
  │                 jcasselman@obinskaplan.com
24│
25│ Telephone:    (310) 552-0130
  │ Facsimile:    (310) 229-5800
26│
27│
28│

PROOF OF SERVICE

| | |
|---|---|
| George T. McDonnell<br>Mark R. Hartney<br>Rachel M. Sanders<br>Allen Matkins Leck Gamble Mallory & Natsis, LLP<br>865 South Figueroa St., Ste. 2800<br>Los Angeles, CA 90017-2543<br><br>Email:       tmcdonnell@allenmatkins.com<br>             mhartney@allenmatkins.com<br>             rsanders@allenmatkins.com<br><br>Telephone:   (213) 622-5555<br>Facsimile:   (213) 620-8816 | Attorneys for Transbay Tower LLC and Boston Properties, Inc. |
| Craig Wallace<br>Smith Currie & Hancock LLP<br>275 Battery, Suite 1300<br>San Francisco, CA 94111<br><br>Email:       cwwallace@smithcurrie.com<br><br>Telephone:   (415) 394-6688<br>Facsimile:   (415) 394-6687 | Attorneys for Cross-Defendants Shimmick Nicholson, JV |
| Clark T. Thiel<br>Anna Lau<br>Pillsbury Winthrop Shaw Pittman LLP<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5988<br><br>Email:       clark.thiel@pillsburylaw.com<br>             anna.lau@pillsburylaw.com<br><br>Telephone:   (415) 983-1000<br>Facsimile:   (415) 983-1200 | Attorneys for Cross-Defendant Clark/Hathaway Dinwiddie, JV |
| David W. Smiley<br>Derek J. Onysko<br>FINICH, THORNTON & BAIRD, LLP<br>4747 Executive Drive, Suite 700<br>San Diego, CA 92121-3107<br><br>Email:       dsmiley@ftblaw.com<br>             donysko@ftblaw.com<br><br>Telephone:   (858) 737-3100<br>             (858) 737-3101 | Attorneys for Cross-Defendant Balfour Beatty Infrastructure, Inc. |

PROOF OF SERVICE

| | | |
|---|---|---|
| 1 | Steven M. Cvitanovic<br>Renata L. Hoddinott | Attorneys for Cross-Defendant<br>Webcor-Obayashi Joint Venture |
| 2 | Omar Parra<br>HAIGHT BROWN & BONESTEEL LLP | |
| 3 | Three Embarcadero Center, Suite 200<br>San Francisco, CA  94111 | |
| 4 | | |
| 5 | Email:       scvitanovic@hbblaw.com<br>             rhoddinott@hbblaw.com<br>             oparra@hbblaw.com | |
| 6 | | |
| 7 | Telephone:   (415) 546-7500<br>Facsimile:   (415) 547-7505 | |
| 8 | Cynthia Shambaugh<br>Paula Kirk | Attorneys for Cross-Defendant<br>Drill Tech Drilling & Shoring, Inc. |
| 9 | Jill Thornhill<br>LAW OFFICES OF THOMAS J. BURNS | |
| 10 | 525 Market Street, Suite 2900<br>San Francisco, CA  94105-2737 | |
| 11 | | |
| 12 | Email:       cynthia.shambaugh@zurichna.com<br>             paula.kirk@zurichna.com<br>             jill.thornhill@zurichna.com | |
| 13 | | |
| 14 | Telephone:   (415) 227-2300<br>Facsimile:   (415) 227-2360 | |
| 15 | | |
| 16 | Jennifer K. Stinnett<br>Ronald R. Roundy | |
| 17 | CHRISTENSEN HSU SIPES LLP | |
| 18 | 2485 Natomas Park Dr., Ste. 315<br>Sacramento, CA  95833 | |
| 19 | Email:       jennifer@chs.law | |
| 20 |             ronald@chs.law | |
| 21 | Telephone:   (916) 443-6909<br>Facsimile:   (916) 313-0645 | |
| 22 | Russell F. Sauer, Jr.<br>Amy C. Quartarolo | Attorneys for Cross-Defendant<br>Kilroy Realty Corporation, Kilroy |
| 23 | Latham & Watkins LLP | Services, LLC, And KR 350<br>Mission LLC |
| 24 | 355 South Grant Avenue, Suite 100<br>Los Angeles, CA  90071-1560 | |
| 25 | Email:       Russell.Sauer@lw.com<br>             Amy.Quartarolo@lw.com | |
| 26 | | |
| 27 | Telephone:   (213) 891-8966<br>Facsimile:   (213) 891-8763 | |
| 28 | | |

PROOF OF SERVICE

| | |
|---|---|
| Glenn T. Barger<br>John brazier<br>CHAPMAN GLUCKSMAN DEAN ROEB & BARGER<br>11900 West Olympic Blvd., Ste. 800<br>Los Angeles, CA  90064-0704<br><br>Email:        gbarger@cgdrblaw.com<br>                 jbrazier@cgdrblaw.com<br><br>Telephone:   (310) 207-7722<br>Facsimile:    (310) 207-6550 | Attorneys for Cross-Defendant<br>DND Construction |
| William J. Ingalsbe<br>Diana M. Dron<br>J. Michael Grimm<br>LAW OFFICES MONTELEONE & McCRORY, LLP<br>725 South Figueroa Street, Suite 3200<br>Los Angeles, CA  90017<br><br>Email:        ingalsbe@mmlawyers.com<br>                 dron@mmlawyers.com<br>                 grimm@mmlawyers.com<br><br>Telephone:   (213) 612-9900<br>Facsimile:    (213) 612-9930 | Attorneys for Cross-Defendant<br>Glacier Northwest, Inc. |
| Jon B. Zimmerman<br>Gregory B. Cohen<br>Matthew Wendt<br>Jennifer Timbol<br>MESSNER REEVES LLP<br>160 W. Santa Clara St., Ste. 1000<br>San Jose, CA  95113<br><br>Email:        jzimmerman@messner.com<br>                 gcohen@messner.com<br>                 mwendt@messner.com<br>                 jtimbol@messner.com<br><br>Telephone:   (408) 298-7120<br>Facsimile:    (408) 298-0477 | Attorneys for Cross-Defendant<br>Central Concrete Supply Co., Inc. |
| Mark D. Petersen<br>Matthew S.L. Cate<br>Farella Braum + Martel LLP<br>235 Montgomery Street, 17th Floor<br>San Francisco, CA  94104<br><br>Email:        mpetersen@fbm.com;<br>                 mcate@fbm.com<br><br>Telephone:   415-954-4400<br>Facsimile:    415-954-4480 | Attorneys for Cross-Defendant<br>Pelli Clarke Pelli Architects, Inc. |

PROOF OF SERVICE

| | |
|---|---|
| Jill J. Lifter<br>RYAN & LIFTER<br>A Professional Corporation<br>2000 Crow Canyon Place, Ste. 400<br>San Ramon, CA  94583-1367<br><br>Email:      jlifter@rallaw.com<br><br>Telephone:    (925) 884-2080<br>Facsimile:    (925) 884-2090 | Attorneys for Cross-Defendant<br>Enclos Corp. |
| Busby Zappala & Sanchez LLP<br>Ralph A. Zappala<br>BUSBY ZAPPALA & SANCHEZ LLP<br>251 Lafayette Circle, Suite 350<br>Lafayette, CA  94549<br><br>Email:      rzappala@bzlawllp.com<br><br>Telephone:    (925) 299-9600<br>Facsimile:    (925) 299-9608<br><br>Kennett L. Patrick<br>Victoria Beckel<br>L. Taylor<br>WINET PATRICK GAYER CREIGHTON & HANES<br>1215 West Vista Way<br>Vista, CA  92083<br><br>Email:      kpatrick@wpgch.com<br>               vbeckel@wpgch.com<br>               ltaylor@wgpch.com<br><br>Telephone:    (760) 758-4261<br>Facsimile:    (760) 758-6420 | Attorneys for Cross-Complainant<br>Viking Drillers, Inc. |
| Thomas B. Wait<br>Robert A. Hufnagel<br>Wait & Hufnagel<br>Attorneys at Law<br>250 West First Street, Suite 222<br>Claremont, California 91711<br><br>Email:      tomwait@wait-hufnagel.com<br>               rhufnagel@wait-hufnagel.com<br><br>Telephone:    (909) 621-5672<br>Facsimile:    (909) 399-0645 | Attorneys for Cross-Defendant<br>Joseph H. Albanese, Inc. |

PROOF OF SERVICE